## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CENTRAL AMERICAN REFUGEE CENTER, M.C., and V.A., on behalf of themselves and all others similarly situated, | Case No.: 23-cv-5412 |
| *Plaintiffs*, | **COMPLAINT** |
| v. | |
| NASSAU COUNTY, NASSAU COUNTY POLICE DEPARTMENT, and PATRICK RYDER, in his official capacity as Commissioner of Nassau County Police Department, OFFICER JOHN DOE, head of the Internal Affairs Unit of the Nassau County Police Department, and SERGEANT SABRINA GREGG, Nassau County Police Department Language Access Coordinator, | |
| *Defendants*. | |

Plaintiffs CENTRAL AMERICAN REFUGEE CENTER – CARECEN (NY), M.C., and V.A.,[1] by and through their attorneys, LatinoJustice PRLDEF ("LatinoJustice") respectfully allege as follows:

### PRELIMINARY STATEMENT

1.      This civil rights action is brought on behalf of all Limited English Proficient ("LEP") individuals who are, have been, or will be at risk of being subject to discriminatory and unconstitutional denials of language access services by the Nassau County Police Department ("NCPD"). Named Plaintiffs, on behalf of a class of all similarly situated individuals, bring this

---

[1] M.C. and V.A. intend to file a motion to proceed under pseudonyms pursuant to *Sealed Plaintiff v. Sealed Defendant #1*, 537 F.3d 185 (2d Cir. 2008).

action to remedy the NCPD's longstanding and continuing practice of discriminatory and unconstitutional conduct toward LEP individuals.

2.     Ten years ago, Nassau County (the "County") passed two executive orders requiring public-facing agencies to provide equal access to services for those with limited English proficiency. Ten years later, NCPD continues to deny LEP community members adequate translation and interpretation, equal access to NCPD services, and fair treatment under the law based on their national origin and LEP status.

3.     This practice is in stark contrast to the County's stated policy regarding language access—a stated policy that is not followed in practice and which officers can breach with impunity.

4.     Plaintiffs are a non-profit organization serving Nassau County's large and growing immigrant population and two former residents of Nassau County who were denied language assistance by NCPD. As demonstrated below, these are not isolated incidents, but part of a historical and continuing pattern of intentional discrimination and deliberate indifference towards the constitutional rights of Nassau County's LEP community members.

5.     Through this action, Plaintiffs seek declaratory and injunctive relief for Defendants' violations of federal and state law.

## JURISDICTION & VENUE

6.     This court has subject-matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3-4), as this action seeks redress for the violation of Plaintiffs' constitutional and civil rights.

7.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

8.      This Court also has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over Plaintiffs' related claims arising under the New York State Constitution.

9.      This court has personal jurisdiction over all Defendants as they are domiciled in New York, among other bases of personal jurisdiction.

10.     Venue is proper within this Judicial District pursuant to 28 U.S.C. § 1391(b) because all or a substantial part of the events or omissions giving rise to the claims herein occurred in the Eastern District of New York.

## PARTIES

### Plaintiffs

11.     Plaintiff Central American Refugee Center – CARECEN (NY) ("CARECEN") is a not-for-profit 501(c)(3) organization headquartered in Hempstead, Nassau County, New York. CARECEN is one of the largest immigration legal services providers on Long Island with the mission of empowering immigrant communities through legal services, community education, and advocacy. Almost all of CARECEN's clients are LEP.

12.     Plaintiff M.C. is a LEP adult resident of the County of Queens, State of New York and who was denied language access services on at least two separate occasions by NCPD when she was a resident of Nassau County between 2014 and 2022.

13.     Plaintiff V.A. is a LEP adult resident of the County of Queens, State of New York and who was denied language access services by NCPD when she was a resident of Nassau County between 2020 and 2021.

3

14.     The named Plaintiffs bring this action on behalf of themselves and as representatives of the Class of all similarly situated Limited English Proficient individuals who are, have been, or will be at risk of being subject to discriminatory and unconstitutional denials of language access services by NCPD.

**Defendants**

15.     Defendant Nassau County is a county within the state of New York. Pursuant to the Municipal Home Rule Law, Nassau County is authorized to issue a county charter that provides for the "agencies or officers responsible for the performance of the functions, powers and duties of the county." N.Y. MHR Ch. 36-1, Art. Part 1 § 33(3)(b). Nassau County is ultimately responsible for the Nassau County Police Department and therefore liable for injuries to Plaintiffs and members of the class caused by the policies and practices set forth below.

16.     Defendant Nassau County Police Department ("NCPD") was established by Article VII, Section 801 of the Nassau County Charter that was passed in accordance with the Municipal Home Rule Law. NCPD is headquartered at 1490 Franklin Avenue, Mineola, NY, 11501, in Nassau County. NCPD operates eight precincts. NCPD has established the policies and practices that led to Plaintiffs' and class members' injuries.

17.     Defendant Patrick Ryder is, and at all times relevant to the Complaint was, the Commissioner of the Nassau County Police Department and serves as NCPD's chief policy officer, responsible for the policies of NCPD. He is and was, at all relevant times herein, responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of the police officers under his command who are or were employed by NCPD, including the individual defendants named herein. Defendant Ryder's official actions are the direct and

proximate causes of the injuries to Plaintiffs and evinced a deliberate indifference to Plaintiffs' legal rights. He is sued in his official capacity for actions that he undertook under color of state law.

18.     Defendant Officer John Doe is, and at all times relevant to the Complaint was, the head of the Internal Affairs Unit for NCPD and serves as the chief policy officer with regard to internal investigations and discipline of NCPD officers.  He is and was, at all relevant times herein, responsible for developing policies regarding the investigation, discipline, counseling, and control of police officers who are or were employed by NCPD. Defendant Officer John Doe's official actions are the direct and proximate causes of the injuries to Plaintiffs and evinced a deliberate indifference to Plaintiffs' legal rights. He is sued in his official capacity for actions that he undertook under color of state law.

19.     Defendant Sergeant Sabrina Gregg is the designated Language Access Coordinator for NCPD. As such, she is responsible for supervising NCPD's Language Access plan, instituting measures to monitor the success of the plan, and reviewing and updating the plan on a semi-annual basis. She is the chief policy officer for NCPD with regard to the implementation, monitoring, training, and modification of the Language Access Plan. Defendant Gregg's official actions are the direct and proximate causes of the injuries to Plaintiffs and evinced a deliberate indifference to Plaintiffs' legal rights. She is sued in her official capacity for actions that she undertook under color of state law.

20.     Nassau County and NCPD have been recipients of millions of dollars of federal funds during the relevant period.

5

## CLASS ACTION ALLEGATIONS

21.    Plaintiffs bring this action for declaratory and injunctive relief pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on their behalf and, in the case of Individual Plaintiffs M.C. and V.A., as representatives of the following class of individuals: All past, present, and future Limited English Proficient individuals who are, have been, or will be at risk of being subject to discriminatory and unconstitutional denials of language access services by NCPD, including but not limited to policies, patterns, and practices in violation of law (the "Class").

22.    Plaintiffs and the Class have suffered personal injury as a direct and proximate result of Defendants' actions herein for which an award of declaratory and injunctive relief is appropriate. The named Plaintiffs herein are members of the Class they seek to represent.

23.    **Numerosity:** The Class includes hundreds, if not thousands, of individuals. Members of the Class are so numerous that joinder is impracticable because, based on information and belief, many of the members of the Class are not aware of the fact that their constitutional rights have been violated and that they have the right to seek redress in court. Many members of the Class are without the means to retain an attorney to represent them in a civil rights lawsuit. Moreover, many Class members who have been victimized by Nassau County and NCPD's unconstitutional practices do not bring individual claims for fear of retaliation and reprisal by NCPD officers. There is no appropriate avenue for the protection of class members' constitutional rights other than a class action.

24.    **Commonality**: There are questions of law and fact common to the Class including, but not limited to:

6

a.    Whether Defendants engage in a policy, practice, and/or custom of intentional discrimination against Limited English Proficient individuals based on their national origin and limited English proficient status;

b.    Whether Defendants' failure to properly train, supervise, and investigate the racially motivated behavior of NCPD police officers, particularly whether it properly investigates and pursues allegations of failure to provide language access, constitutes deliberate indifference to the violations of the Plaintiffs' and Class members' rights;

c.    Whether Nassau County, Commissioner Ryder, Officer John Doe, and Sergeant Gregg have sanctioned and/or failed to rectify unlawful intentional discrimination against LEP individuals by members of NCPD;

d.    Whether the Class as a whole is entitled to permanent injunctive relief against Defendants, including, but not limited to, a mandatory injunction;

e.    Whether the class as a whole is entitled to a declaratory judgement that the acts of Defendants alleged herein and to be provided by the evidence constitute actionable violations of the civil and constitutional rights of each member of the Class; and,

f.    Whether the Class as a whole is entitled to an award of its attorneys' fees and litigation costs to be paid by Defendants under 42 U.S.C. § 1988(b).

g.    These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

25.     **Typicality:** The claims of the named Plaintiffs are typical of the claims of the Class they seek to represent in that the named Plaintiffs and all members of the proposed Class are LEP individuals who were denied translation or interpretation by NCPD, which deprived them of equal access to NCPD's services and/or protection. As a result of NCPD's pattern and practice of denying assistance to LEP individuals, named Plaintiffs faced a range of harms that are typical of those faced by the Class, including being barred from reporting a crime, seeking legal protection from an abusive partner or landlord, receiving notice of and an opportunity to correct the contents of police reports and criminal complaints, and communicating effectively with the police in a wide range of circumstances.

26.     As long as NCPD engages in the policy, practice, and/or custom of discrimination against LEP individuals based on their national origin and LEP status, the named Plaintiffs are, and will remain, at high risk of deprivation of access to NCPD's assistance and services. Indeed, the named Plaintiffs have already been directly injured and burdened by NCPD's failure to provide translation or interpretation in a range of sensitive scenarios. The proposed Class seeks declaratory and injunctive relief as a result of injuries its members have sustained due to Defendants' conduct. The pursuit of this relief by the Class representatives for their injuries and losses will work to benefit the entire proposed Class they seek to represent.

27.     **Adequacy of Representation:** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class they represent. The named Plaintiffs have retained counsel competent and experienced in class action litigation and civil rights law. Accordingly, the interests of the Class will be adequately protected and advanced. In addition, there is no conflict of interest between the named Plaintiffs and members of the Class. The interests of the

named Plaintiffs are aligned because members of the class have an interest in securing their right to prospective relief preventing future harmful conduct by Defendants.

28.     Notice can be provided to Class members by published notice.

29.     Certification of the Class is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants have acted in a similar, virtually identical, way against each member of the Class, so that final injunctive relief, specifically appropriate mandatory injunctions, with corresponding declaratory relief is appropriate respecting the Class as a whole.

30.     Certification of the Class is also appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because the questions of law and fact common to the members of the Class predominate over any questions affecting only individual members. This class action is superior to other available remedies for the fair and efficient adjudication of this controversy.

## STATEMENT OF FACTS

### Background

31.     According to the most recent U.S. Census, Nassau County is home to over 418,000 residents (30%) over 5 years old that speak a language other than English at home. Approximately 22.4% of County residents—almost 310,000 people—are foreign born. In the past two decades, Nassau County's population growth has been fueled almost entirely by immigrants, a significant percentage of whom are Latino. Long Island is also home to a growing Haitian refugee population, totaling more than 26,000 people in 2021, largely residing in Nassau County.

32.     Nassau County Police Department is one of the largest police departments in the country. However, the diversity of its personnel does not reflect the communities it serves. While over

9

40% of Nassau County identifies as non-White, only 13.2% of NCPD's police force identifies as either Black, Latino, Asian, or "other."

33.     For years, Defendants have engaged in, and are continuing to engage in, a pattern and practice of discriminatory and unconstitutional conduct toward the growing population of LEP individuals in Nassau County.

34.     Encounters with law enforcement agents frequently involve unfamiliar or intimidating situations. Even for individuals who speak, read or understand some English, they may still have trouble understanding complex forms and instructions or explaining themselves proficiently, particularly during a time of crisis or enhanced stress.

35.     Failure to provide timely interpretation and translation services in this context can prevent individuals from receiving emergency assistance, obtaining an order of protection, reporting a crime, and effectively communicating with police in a range of circumstances. Denials of language assistance by law enforcement agencies also have a traumatizing effect, for instance, where children are used as translators.

36.     Ten years ago, then-Nassau County Executive Edward Mangano issued two executive orders (as discussed below) requiring county agencies receiving federal funding to offer equal access to services for LEP individuals. To date, Defendants have failed to comply with the County's own executive orders.

**NCPD's Pattern and Practice of Discriminatory and Unconstitutional Conduct Towards LEP Individuals Directly Harmed and Continues to Harm Named Plaintiffs**

*Plaintiff CARECEN*

37.    For more than forty years, CARECEN has provided a range of services to immigrant community members, including legal representation in immigration proceedings and applications, English language education, and social work services for recently arrived immigrants. Almost all of CARECEN's clients are LEP.

38.    Because of NCPD's pattern and practice of discriminatory and unconstitutional conduct toward LEP individuals in Nassau County, CARECEN has repeatedly diverted time and resources away from its regular activities to assist clients who have been denied linguistically appropriate services by NCPD.

39.    CARECEN staff repeatedly must help clients to problem solve after language access denials and spend time locating and communicating with outside assistance to help clients file complaints against NCPD.

40.    For example, as recently as April 2023, CARECEN represented a client who was denied interpretation during a domestic dispute and when he tried to call a friend to help interpret for him, NCPD officers took his phone away. Such incidents are not isolated, but frequently arise and create significant challenges for CARECEN during the course of its representation of approximately one thousand immigrant community members each year.

*Plaintiff M.C.*

41.    Plaintiff M.C. is a native Spanish language speaker. She does not read, write, or understand English aside from basic terms.

11

42.     M.C. currently resides in Queens, New York and was a resident of Nassau County between 2014 and 2022.

43.     M.C. still frequents Nassau County for child visitations between her daughter and former partner.

44.     The first time M.C. contacted NCPD was in September 2020.

45.     During a domestic dispute with her partner, M.C. found explicit photos and communications between him and other women on his phone. When M.C. tried to take the cell phone, M.C.'s partner pushed her up against a chair.

46.     M.C. contacted the police. Upon their arrival, they entered the home and began to speak in English. Despite being unable to communicate in English, she was not offered any interpretation services.

47.     M.C. called her son by phone and ask him to speak to the officers in English for her. He was unable to do so as he was at work.

48.     The officers attempted to communicate with M.C. but once they realized she could not speak English, they turned to her partner to communicate with him about the incident.

49.     The officers communicated exclusively with M.C.'s partner and she was unable to communicate the physical altercation that took place.

50.     After communicating with her partner, the officers left the home. No one followed up to discuss the incident with her directly or assess her safety. NCPD did not provide M.C. with any paperwork regarding the incident.

51.     On July 4, 2022, M.C. contacted the police regarding a second domestic dispute.

52.     Again, M.C. and her partner engaged in a physical altercation over his cellphone and messages she had seen of him communicating with another woman.

53.     M.C. attempted to grab the phone when she was then shoved against a wooden chair in their bedroom and then up against the wall. M.C. walked away from the altercation with scratches on her arms, neck, back and both hands, bruises on her leg and a nosebleed. M.C. was also recovering from breast surgery and realized the incision areas were also bleeding.

54.     M.C.'s seven-year-old daughter entered the room demanding that her dad stop hitting M.C. M.C.'s daughter proceeded to grab her tablet and began recording the altercation. Once M.C.'s partner saw their daughter recording, he stopped trying to engage with her.

55.     M.C. called 911 and began to speak in Spanish and then in limited English exclaimed "Help me, Help me." She added, "No English, Speak Spanish" but the operator continued to communicate in English. She passed the phone to her young daughter who had to explain the incident and provided their home address.

56.     Thereafter, NCPD officers arrived at the home and again M.C. tried to communicate that she did not speak English. The officers eventually called for a Spanish speaking officer.

57.     While waiting for the Spanish speaking officer to arrive, the officers began to communicate with M.C.'s seven-year-old daughter in English about the incident. M.C. could not understand the questions her child was asked or what responses were provided.

58.     Once the Spanish speaking officer arrived, M.C. began to explain what occurred. M.C. asked the officer to provide her with a document or report to use against her husband and prevent him from physically attacking her. The Spanish speaking officer concluded with "We'll see what we do."

59.     While the Spanish speaking officer spoke with M.C.'s partner, she sat downstairs and was eventually signaled by one of the English-speaking officers to come over to the table and sign a document. The officer did not communicate the contents of the document prior to or after signing. The Spanish speaking officer did not assist in translating the document.

60.     Eventually, M.C. sought outside assistance to obtain a translation of the police report and realized the report failed to detail her injuries.

61.     M.C. decided to file a complaint against the police department for failure to provide adequate language assistance during the domestic violence incident. Using NCPD's online portal for filing complaints and with assistance from a local non-profit, M.C. filed a complaint against NCPD. While she received a complaint number, no one from NCPD ever followed up with her and she is not aware of any investigation regarding her complaint.

*Plaintiff V.A.*

62.     Plaintiff V.A. is a native Spanish language speaker.

63.     On July 19, 2020, she contacted NCPD after her landlord changed the locks to the apartment.

64.     At the time the locks were changed V.A. was inside the home with her children. There was no pending eviction case.

65.     V.A. called 911 and in Spanish requested an interpreter. After a brief hold, an interpreter joined the call. She explained the incident and was informed officers would come to the home.

66.     A few moments later, two officers from NCPD's Third Precinct, Post 321 arrived at the home. Since V.A. had just informed the 911 operator of her need for interpretation services, she assumed the officers would be aware she did not speak English.

67.    One of the officers approached V.A. and began to communicate in English. V.A. responded by requesting a "translator" to which the officer responded "**No, this is the United States of America, we speak English in the United States.**"

68.    V.A. exclaimed in Spanish that she was aware of her rights and again continued to ask for an interpreter to no avail.

69.    V.A. recorded this interaction on a camera she had previously installed because the landlord had been entering the home without her knowledge.

70.    After approximately 20 minutes of asking for an interpreter, V.A. called 911 again and informed them that the officers had not provided her with an interpreter. It was not until her second call to 911 that an interpreter was provided.

71.    The officers never took down a report or handed her any paperwork.

72.    After the incident, V.A. decided to file a complaint against the officer.

73.    On multiple different occasions, V.A. went to the precinct where she believed the officer was assigned and was told it was not the correct place to make a complaint. She was never provided guidance about where or how to file a complaint against the officer.

### Defendants' History of Discriminatory Treatment of LEP Individuals in Nassau County

74.    In 2013, then-Nassau County Executive Mangano issued two executive orders on language access, which remain in effect until this day. The first of Nassau County's two executive orders on language access was significantly more limited in scope than the County had originally represented to community-based organizations and, as a result, was met with immense disappointment and opposition by advocates and LEP community members. The lackluster order – Executive Order 67 ("EO 67"), issued in July 2013 – was limited to the requirement that

15

county agencies make available on the County website translations of "vital documents" in the County's six most common non-English languages, assign a Language Access Coordinator, and develop a language access plan. But it was silent on other critical requirements needed to comply with federal law, including competent telephonic and in-person interpretation, training requirements, translation of signage, and data collection and reporting requirements. A true and accurate copy of the Executive Order 67-2013 is attached hereto as Exhibit 1.

75.     After sustained pressure from advocates, including phone calls, emergency meetings, and word of an imminent public campaign, on August 15, 2013, then-County Executive Mangano signed a second executive order—Executive Order 72 ("EO 72")—to address the deficiencies in the original EO 67. EO 72 provides that each public-facing Nassau County agency publish a language access plan, provide competent in-person and telephonic translation and interpretation services, provide the Deputy County Executive with a list of all competent bilingual employees, provide employee training on the department's language access plan, and issue a public notice of language access services. EO 72 also prohibits county employees from using a request for language services as a basis for inquiring into confidential information relating to immigration status. A true and accurate copy of EO 72-2013 is attached hereto as Exhibit 2.

76.     Since 2013, despite countless attempts by community-based advocates to work with Defendants to implement the promises of the executive orders, there has been little meaningful progress made. The County's promises have rung hollow.

77.     For instance, after the signing of EO 67 and EO 72, community-based advocates and organizations made numerous attempts to contact the Nassau County Executive Office to inquire about the status of implementation. Each time, they received an insufficient response or no

response. Advocates also launched numerous campaigns and rallies highlighting Defendants' noncompliance with federal law and the executive orders.

78.     As reported by *Newsday* in July 2014*,* one member of the Long Island Civic Engagement Table remarked "this shows without a doubt that Nassau County has failed to meet its own language access policy." *See* Paul Larocco, "Nassau Faulted on Language Services," *Newsday*, Aug. 18, 2014.

79.     After the one-year anniversary of EO 67 and 72, volunteer advocates led by Long Island Language Advocates Coalition ("LILAC"), a coalition of diverse community-based organizations that works to break down barriers for LEP community members, began language access testing of county agencies, including the NCPD. The reports of these initial audits were made public in August 2015, in a report co-authored by LILAC, Health and Welfare Council of Long Island, and Long Island WINS. The report, titled *Language Access Denied: Ed Mangano's Broken Promise to Nassau County,* details the history of local advocates' efforts to bring about language access compliance, as well as the results of volunteer audits conducted in August 2014, April 2015, and July 2015. A copy of the report is attached hereto as Exhibit 3.

80.     **Volunteer Audit #1: August 2014**. As detailed in *Language Access Denied*, in August 2014, volunteers conducted language access testing through phone calls, checking websites, and in-person visits to numerous County agencies, including NCPD. NCPD, along with all other audited agencies, was found to be deficient in providing language assistance. Advocates issued the county a failing grade in complying with its own executive orders. *See* Ex. 3, Appendix 2.

81.     **Volunteer Audit #2: April 2015**. In April 2015, volunteers conducted another round of testing, including to NCPD headquarters and all precincts, with callers speaking Mandarin

Chinese, Spanish, Korean, Haitian Creole and Russian. Volunteer testers requested language assistance by stating the language they were seeking, for example, "Spanish?" No false reports or requests for emergency assistance were made. Again, NCPD was found to be deficient in its provision of language assistance.

82.     During the audit, volunteer test callers were disparaged on account of their perceived national origin and LEP status. For example, one Spanish speaking caller to NCPD, who was unable to receive any assistance, was told, in English "**If problema, you have to call 911.**" Another female Spanish-speaking volunteer caller to the First Precinct was degradingly referred to as "**Mami**" by a male NCPD officer. The officer then proceeded to intimidate her, asking **where she lived, how many years she had lived in this country, and why she did not speak English**. Not a single caller was immediately transferred to a professional interpreter.

83.     In addition to the calls, in April 2015, volunteer auditors also made in-person visits to five of NCPD's eight police precincts and police headquarters. Auditors reported that not a single location had signs posted informing the public of the availability of an interpreter, and the only sign posted in Spanish pertained to drug abuse.

84.     Apprised of these ongoing issues, on June 10, 2015, six Nassau County legislators wrote a letter to the County Executive stating they were "deeply troubled that the County is not enforcing implementation of Executive Orders 67 and 72 and that its agencies are not providing adequate interpretation and translation services or translation of vital documents into the six most frequent languages, as promised." The legislators also expressed their embarrassment that the County Executive "has repeatedly refused to meet with [community-based organizations] to

discuss problems with implementation of the Orders and the resulting disservice to our constituents." Exhibit 3, at Appendix 1.

85.     **Volunteer Audit #3: July 2015**. In July 2015, volunteers conducted another audit in Spanish, finding continued deficiencies in every police precinct. Spanish-speaking callers were unable to obtain any assistance from NCPD precincts 1, 2, 3, 4, and 7 and police headquarters.

86.     In August 2015, after learning of the results of the volunteer audits, the NCPD arranged for a meeting with language access advocates. During the meeting, they acknowledged that there were deficiencies which needed to be addressed and promised to implement changes. While some changes were made to NCPD's paper policy and the rollout of a telephonic interpretation system "Language Line", there have not been meaningful agency-wide improvements in practice and NCPD's language access denials and hostility towards LEP community members continues unchecked.

### *NCPD Has Failed to Provide Language Access for Years*

87.     For years, NCPD has issued paper polices that profess to offer language access that in practice is not provided. The most recent such plan is the 2023 NCPD Language Access Plan ("the Plan").

88.     A true and accurate copy of the Plan is attached as Exhibit 4 (NCPD OPS 3132) and Exhibit 5 (NCPD Language Access Plan 2023 PowerPoint).

89.     Defendant Domestic Liaison Officer Detective Sergeant Sabrina Gregg is designated as NCPD's Language Access Coordinator (LAC). As LAC Defendant Gregg is charged with supervising and monitoring the Plan.

90.     The Plan does not adequately ensure that language access is provided to those who request or need language assistance in Nassau County. Even if it were implemented as it is written, in practice, NCPD makes no effort to enforce the Plan.

91.     The Plan allows NCPD "bilingual" personnel to self-assess their language proficiency. NCPD does not have an objective practice or procedure in place to test whether its officers are truly competent in a foreign language.

92.     The Plan does not ban NCPD personnel from using family members, friends, or passersby as interpreters unless the person (a) has a personal interest in the situation, (b) for admissions, confessions, or sworn statements, or (c) is the perpetrator of a domestic incident and would be translating for the alleged victim or complainant. The Plan only bans the use of minor children as interpreters in "high stress situation."

93.     The Plan does not ban NCPD personnel from inquiring into a person's confidential information relating to immigration status if the person is charged with a crime.

94.     The Plan instructs NCPD personnel to say "un momento" to an LEP caller, regardless of whether the caller is a Spanish speaker.

95.     NCPD currently uses a phone-based service called "Language Line" that gives officers access to an interpreter in over 250 languages. Based on information and belief, NCPD started implementing the use of Language Line in or around October 2018.

96.     Based on information and belief, the only language access data collected by the NCPD is the number of times Language Line is affirmatively used by NCPD personnel. NCPD does not appear to collect or report data on the number of times officers fail to use Language Line.

97.     Based on information and belief, NCPD does not collect or report data on the number of times community members request language assistance.

98.     NCPD does not appear to collect or report data on the number of times community members file a complaint relating to the denial of language access services. In response to FOIL requests, NCPD has not produced any documents or statistics relating to complaints for failure to provide language access.

99.     As set forth below, NCPD officers do not, in practice, follow the Plan. And Defendants do not expect them to or seek to hold them accountable when they do not.

100.    NCPD officers do not follow the Plan because Defendants do not require them to. The policies and practices of NCPD, the County, and the Individual Defendants have resulted in a widespread informal policy that compliance with the Plan is entirely voluntary.

101.    Defendants have instituted these policies and practices with deliberate indifference towards the constitutional and civil rights of LEP residents of Nassau County.

102.    Plaintiffs' constitutional injuries are a direct and proximate cause of Defendants' actions.

*A Recent Audit Shows NCPD Fails to Provide Spanish Language Access Almost Half the Time*

103.    Between February and April 2022, the New York Immigration Coalition ("NYIC") and LILAC conducted additional testing to determine NCPD's compliance with the Plan. A report they issued outlining their findings is attached as Exhibit 6.

104.    **Volunteer Audit #4: February-April 2022:** In 2022, volunteers conducted an audit of all eight NCPD precincts and police headquarters, seeking assistance in Spanish for non-emergency questions designed to assess whether NCPD would accommodate non-English speaking callers in a timely and professional manner and comply with the Plan by connecting the

caller to a fluent bilingual officer or a professional interpreter, such as through Language Line. In total, seven volunteers made ninety-four calls requesting information in Spanish. The testers were unable to obtain language assistance or get the requested information 44 times (46.8% failure rate). In the eight calls made to NCPD headquarters none of the testers were provided with help in the language requested.

105.    Testers also recorded contemporaneous notes about their experience on a spreadsheet. Numerous testers noted being hung up on after rude, impatient, or hostile treatment from NCPD officers. Several officers did not know how to use Language Line or did not try to use it at all. In some cases, callers felt intimidated by officers who insisted that the caller give them personal information or appear in person at the precinct in order to receive service. Some officers who spoke Spanish poorly attempted unsuccessfully to speak to callers in Spanish instead of connecting them to a professional interpreter through Language Line. In cases where testers did receive help from bilingual officers, they reported having more positive interactions.

106.    NCPD has been made aware of the findings of the report and has failed to take meaningful action.

107.    On September 27, 2022, representatives from LILAC and LatinoJustice attended a Hispanic Heritage Month event at the NCPD Training and Intelligence Center in Uniondale. In responding to the 2022 auditing and report by LILAC and NYIC, NCPD personnel responded defensively to advocates, suggesting they were "disingenuous," questioned the "veracity" of advocates' reports of language access failures, and concluded "obviously we're on two different pages here." NCPD personnel repeatedly made reference to the number of times Language Line

was affirmatively used but could not or would not confirm if NCPD would take steps to assess its failure rate.

108.     As advocates pointed out, no Spanish translation was offered or made available at the Hispanic Heritage Month event.

109.     On October 6, 2022, Defendant Ryder spoke before the Nassau County Legislature and responded to LILAC and NYIC's 2022 testing report. Again, Defendant Ryder recited the affirmative times that Language Line has been used, but he denied being aware of any language access complaints. In response to specific incidents referred to in LILAC and NYIC's report, Defendant Ryder concluded "I don't believe my officers acted that way."

110.     In its Police Reform EO203 2022 Year End Follow-Up Report, NCPD alleged that it began its own language access audits, consisting of four "controlled calls" to an unspecified precinct, one in Hindi, one in Punjabi, and two in Spanish.

111.     Although NCPD gives officers the opportunity to connect individuals with language access services, in practice officers systemically fail to do so, as the LILAC/NYIC report demonstrates and as Plaintiffs' experiences demonstrate.

112.     NCPD moreover does not investigate complaints of failure to provide language access and does not discipline officers even when presented with evidence that officers violated the Plan and did not provide language access.

113.     Plaintiffs have filed complaints with NCPD's Internal Affairs Unit and have set forth specific incidents of failure to provide language access—including an incident in which the complainant was willing to provide video evidence of an officer refusing to provide language access—and have received no investigative follow-up or response. The NCPD never saw the

video because they denied the complainant an opportunity to file a complaint in person and correspondingly never investigated.

114.    Instead, Defendant Ryder has stated he is not aware of any complaints and pre-emptively cleared his officers of wrongdoing by stating "I don't believe my officers acted that way."

115.    In fact, Defendants simply ignored the many complaints they received out of deliberate indifference to the constitutional rights of LEP residents of Nassau County.

116.    By publicly stating that no complaints existed and no officer had failed to provide language access—statements that Defendant Ryder knew were untrue when he made them—NCPD sent a clear message to its officers. Compliance with the Plan is entirely optional and any officer who chooses not to provide language access is free to do so with no repercussions.

117.    Each Plaintiff has been denied language access by NCPD officers and has sought to have the officer who denied language access investigated or otherwise held accountable. Their complaints have gone unanswered, uninvestigated, and unheard.

118.    NCPD personnel not only fail to provide language services, but on some occasions actively mock and humiliate LEP individuals who request such services.

119.    Instead of using appropriate Language Line services, NCPD officers have used minor children as interpreters during domestic violence disputes.

120.    The immigrant communities served by CARECEN are particularly vulnerable to NCPD's unlawful practices, which leave them unable to communicate with police in emergency situations, to get the protection they need, to file police reports, and to obtain medical assistance.

121.    Plaintiffs have suffered various injuries from NCPD's language access: they have been asked to sign summaries of interviews they do not understand, they have been denied protective

24

orders when they sought one against a violent partner, their children have been forced to interpret leading to traumatization and inaccurate reports, they have been denied assistance when calling for help, and they have been told that this is all their fault: "This is the United States. We speak English."

122.    These actions by NCPD officers constitute the NCPD's real language access policy—one in which any officer can deny any person language access with complete impunity.

**NCPD's Internal Affairs Unit Fails to Investigate Claims of Denial of Language Access as Part of a Broader Failure to Hold NCPD Officers Accountable.**

123.    The NCPD's Internal Affairs Unit has failed to investigate allegations of denial of language access and the NCPD officers who have denied language access to Plaintiffs and others have not been disciplined.

124.    As reported last year by *Gothamist*, over the last six years NCPD's Internal Affairs Unit has never substantiated a civilian complaint against any officer. *See* Charles Lane, "A Screaming Red Flag: Out of 144 Civilian Complaints, Nassau Police Claim Zero Have Any Merit," *Gothamist*, Oct. 12, 2022.

125.    This wasn't because officers of the NCPD do not engage in misconduct. To the contrary, in at least one case where NCPD's Internal Affairs Unit found no misconduct, a federal judge ruled that the evidence showed the officers "created false police records and made demonstrably false statements during the trial, used excessive and improper methods while taking these actions against the plaintiff." *Jenkins v. Cnty. of Nassau*, 540 F.Supp.3d 310, 313 (E.D.N.Y. May 18, 2021). The same evidence—if it was obtained by the NCPD—did not result in a finding of any misconduct at all.

126.    NCPD's Internal Affairs Unit is best known for initiating an investigation against a New York Police Department officer at the behest of a television personality who believed the officer was sleeping with his wife. *See* John Cook, "How Bill O'Reilly Tried to Get His Wife's Boyfriend Investigated By the Cops," *Gawker*, Aug 30, 2011.

127.    Just this year, the State Attorney General's Office announced that it was investigating two NCPD officers who had conducted an illegal strip search and lied about it in federal court. *See* Charles Lane, "2 Nassau County Detectives Are Being Investigated for Misconduct," https://www.wshu.org/long-island-news/2023-04-19/2-nassau-county-detectives-are-being-investigated-for-misconduct, Apr. 19, 2023.

128.    A recent investigation found that NCPD Internal Affairs provides little accountability, even in cases where officers caused serious injury or death.  *See* https://projects.newsday.com/long-island/inside-internal-affairs/.

129.    Nassau County continues to fight in court to withhold from the public disciplinary records and civilian complaint information against its officers, a more restrictive interpretation of the repeal of New York's police secrecy law than nearby departments have imposed. *See New York Civil Liberties Union v. Nassau County*, No. 612605/2021, (Nas. Cty. Sup. Ct. 2021).

130.    Plaintiffs have complained or tried to complain to the NCPD after they were denied language access, hoping that the officers would face the consequences of violating department policy.

131.    Advocates have presented Defendants with specific incidents in which LEP residents of Nassau County have been denied language access. The NCPD have stated publicly that they have investigated these complaints and found the officers did nothing wrong. No investigators

reached out to the individual complainants to take statements as part of these so-called investigations.

132.    NCPD has denied the opportunity to file complaints or failed to investigate or make findings on Plaintiffs' complaints about language access. It has done so because NCPD's actual practice is not to follow the Language Access Plan, but instead to allow officers to deny language access to LEPs with impunity.

133.    Because officers know they will not be disciplined by NCPD's Internal Affairs Unit for failing to provide language access, those who would prefer not to provide language access do so, thereby shutting out Nassau's LEP residents from access to police services and denying them their constitutional rights associated with police encounters.

134.    For any relief to impact NCPD's actual policies and practices, that relief must be directed in part at the Internal Affairs Unit to ensure that NCPD cannot evade its obligations by issuing a paper policy that is not in practice enforced.

**Defendants True Policy is to Allow Officers to Deny Language Access at Their Discretion**

135.    Defendants are aware that a significant portion of the population of Nassau County uses Spanish as a first language, and that many people in the county are more comfortable speaking in languages other than English.

136.    The Plan is merely a "paper policy" that is not followed in practice.

137.    For example, the Plan states that Defendant Gregg will "institute measures to monitor the success of the plan," and that the plan will be "reviewed and updated as necessary on a semi-annual basis." Advocates have pointed out failures in the Plan but no changes have been made to address these failures.

138.     The Plan states that NCPD will ensure that "all current NCPD members receive a copy of the Language Access Plan," and that "Force Member will review the NCPD Language Access Power Point," but does not indicate that officers will be trained, how often they will be trained, or that providing language access is mandatory.

139.     Defendants fail to train officers on their obligation to provide language access to those who need it.

140.     Defendants fail to investigate and discipline officers who do not provide language access to LEP individuals.

141.     Defendants fail to screen officers for language proficiency and instead allow officers to self-certify as proficient in a foreign language when they are not.

142.     Defendants are aware that a significant number of officers do not provide language services to LEP individuals.

143.     Defendants' failure to train officers in their obligations to provide language access demonstrates their deliberate indifference towards their constitutional obligations to provide language access to LEP persons.

144.     Defendants' failure to discipline officers in their obligations to provide language access demonstrates their deliberate indifference towards their constitutional obligations to provide language access to LEP persons.

145.     The failure to train officers in their obligations to provide language access are the moving forces behind Defendants' collective deprivations of Plaintiffs' civil rights under color of law.

146.     Defendants' failure to train and failure to discipline are the proximate causes for Plaintiffs' injuries.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Intentional Discrimination Under
Title VI of the Civil Rights Act of 1964
42 U.S.C. § 2000(d), *et seq*.**

147.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

148.    NCPD is a county agency in receipt of funding from the federal government.

*149.*    Discrimination based on race or national origin is prohibited by recipients of federal financial assistance under 42 U.S.C. § 2000(d), *et seq.*

150.    Defendants, though their policy, custom or practice, intentionally discriminated against Plaintiffs and class members based on their national origins and limited English proficient status in violation of Title VI of the Civil Rights Act and its implementing regulations.

151.    As set forth above, Defendants have issued a Language Access Plan but do not require individual officers to provide language access to those who request or need it, instead leaving it up to the discretion of individual officers as to whether to provide language access.

152.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered injuries and have been deprived of their rights under the civil rights laws.

### SECOND CAUSE OF ACTION
**Violation of the Safe Streets Act 42 U.S.C § 3789d**

153.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

154.    The Safe Streets Act, 42 U.S.C. § 3789d, and its implementing regulations prohibit discrimination, inter alia, on the basis of national origin by programs funded in whole or in part from funds made available under 42 U.S.C. § 3789d(c)(4). The regulations were promulgated by the United States Department of Justice and codified at 28 C.F.R. § 42.203.

155.    NCPD receives federal funding that subjects it to the requirements of the Safe Streets Act.

156.    Defendants, through their policy, custom or practice, discriminated against Plaintiffs based on their national origins and limited English proficient status in violation of the Safe Streets Act and its implementing regulations

157.    As a direct and proximate result of the above-mentioned acts, Plaintiffs have suffered injuries and have been deprived of their rights under the Safe Streets Act and its implementing regulations.

### THIRD CAUSE OF ACTION
### 42 U.S. § 1983 – Equal Protection Discrimination

158.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

159.    Defendants denied Plaintiffs equal access to the services and protections of the NCPD based on their national origins. Such discrimination violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

160.    All Defendants were acting under color of state law when they deprived Plaintiffs of their rights to Equal Protection under the Fourteenth Amendment.

161.    Defendants Ryder, OFFICER DOE, and Sergeant Gregg were acting under color of state law when they developed and implemented policies and practices that were the direct and proximate causes of the depravation of Plaintiffs' Equal Protection rights.

162.    42 U.S.C § 1983 supplies a right of action to recover for these constitutional depravations.

163.    As a direct and proximate result of the above-mentioned acts, Plaintiffs have suffered injuries and damages.

**FOURTH CAUSE OF ACTION**
**42. U.S.C. § 1983 – First Amendment Violation**

164.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

165.    Defendants, through their policy, custom or practice of denying language services to limited English proficient individuals, prevented Plaintiffs from filing complaints and reports and otherwise communicating with police officers from whom they sought assistance.

166.    Defendants acted under color of state law to deprive Plaintiffs of their First Amendment right to petition the government for redress of grievances.

167.    For example, Plaintiff V.A. was denied her right to petition the government for redress of grievances when the officer refused to hear her complaint of an illegal eviction and instead told her, "this is the United States, we speak English." Subsequently, when Plaintiff V.A. made numerous attempts to file a complaint in-person, she was turned away and denied assistance.

168.    Defendants Ryder, OFFICER DOE, and Sergeant Gregg were acting under color of state law when they developed and implemented policies and practices that were the direct and proximate causes of the depravation of Plaintiffs' Equal Protection rights.

169.    42 U.S.C § 1983 supplies a right of action to recover for these constitutional depravations.

170.    As a direct and proximate result of Defendant's actions, Plaintiffs suffered injuries.

**FIFTH CAUSE OF ACTION**
**42 U.S.C. § 1983 – *Monell* Claim**
**First Amendment and Fourteenth Amendment Violations**

171.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

172.    The Fourteenth Amendment violations set forth in Plaintiffs' Third Cause of Action and the First Amendment violations set forth in Plaintiff's Fourth Cause of Action are both the result

of the policies and customs of NCPD to fail to provide language access to LEP community members, and therefore provide for liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 700-01 (1978).

173.    These failures constitute the policy and customs of NCPD under five separate *Monell* theories—they are the result of decisions by individuals with policymaking authority, they are the result of an informal custom, they are the result of NCPD's failure to train its officers, they are the result of NCPD's failure to supervise its officers, and they are the result of NCPD's failure to screen officers for Spanish language proficiency before reporting them as fluent in Spanish.

*Decisions by Policymaking Individuals*

174.    Defendant Ryder has final policymaking authority for NCPD, and constitutes a county policymaker for whom the county is liable for such conduct.

175.    Defendant Officer John Doe has final policymaking authority for the Internal Affairs Unit of NCPD, and constitutes a county policymaker for whom the county is liable for such conduct.

176.    Defendant Gregg has final policymaking authority for the implementation of the Language Access Plan for NCPD, and constitutes a county policymaker for whom the county is liable for such conduct.

177.    Defendants Ryder, Officer John Doe, and Gregg developed and maintained policies, procedures, customs and/or practices exhibiting indifference to the constitutional rights of those in Nassau County with limited English Proficiency.

178.    While NCPD issued a "paper policy" setting forth a Language Access Plan, Defendants Ryder, Officer John Doe, and Gregg made policy decisions that constituted the real NCPD language access policy.

179.    These decisions included decisions by Defendants Ryder and Officer John Doe to refrain from investigating complaints of failure to abide by the Language Access Plan.

180.    These decisions also included a decision by Defendant Ryder not to evaluate compliance with the Plan by recording the number of times that language access was requested, but only recording the number of times it was provided.

181.    These decisions also included decisions by Defendant Gregg not to require officers to provide language access, and not to evaluate how often officers were denying language access to those who requested or needed it.

182.    As a direct and proximate result of the policy decisions by Defendants Ryder, Officer John Doe, and Gregg, NCPD officers regularly fail to provide language access to LEPs in Nassau County.

183.    As a direct and proximate result of the policy decisions by Ryder, Defendants Officer John Doe, and Gregg, Plaintiffs were denied language access by NCPD, resulting in violations of the First and Fourteenth Amendments.

*Informal Custom*

184.    NCPD has developed a persistent, widespread custom and unofficial policy whereby officers are free to provide or decline to provide language access to those who request it at their individual discretion.

185.    Pursuant to this persistent, widespread custom and unofficial policy, Defendants and officers of NCPD denied adequate language access to Plaintiffs and other class members with reckless disregard for their constitutional rights.

33

186.    This persistent, widespread practice of denying language access to those who requested it from NCPD was so pervasive that County officials with policy-making authority tacitly authorized the policy, had actual or constructive knowledge of the widespread custom and unofficial policy, and failed to do anything to end the unconstitutional custom and unofficial policy.

187.    The widespread nature of the practice is evidenced by the findings of the LILAC report, and the failure of NCPD to take any remedial action in response to these findings.

188.    Because the NCPD fails to investigate or discipline officers who deny language access, as evidenced by named Plaintiffs, its officers know that they are free to refuse to provide language access to those who request it, contributing to the widespread informal policy.

189.    By reason of this widespread custom and unofficial policy, Defendants deprived Plaintiffs of their First and Fourteenth Amendment rights, in violation of 42 U.S.C. § 1983.

***Failure to Train***

190.    Defendants failed to train officers in their obligation to provide language access to those who request or need it.

191.    This failure to train is evident in the Plan itself, which requires that every officer in NCPD be provided with the Plan but does not require particularized training in officers' obligations to provide language access to those who request or need it.

192.    This failure to train officers in their obligations to provide language access to those who request or need it was one of the moving forces behind Defendants' collective deprivations of Plaintiffs' First and Fourteenth Amendment rights under color of law.

193.    NCPD's failure to train officers in their obligations was made knowingly and with reckless indifference to the constitutional rights of residents of Nassau County with limited English proficiency.

194.    NCPD's failure to train was made with deliberate indifference to Plaintiffs' constitutional rights.

*Failure to Discipline*

195.    Acting under color of law and pursuant to official policy, practice, or custom, NCPD failed to investigate officers who do not provide language access to those who request or need it.

196.    As set forth above, NCPD Internal Affairs Unit has never substantiated an allegation that an officer failed to provide language access.

197.    Plaintiff M.C. made a complaint online to the NCPD Internal Affairs Unit but never received any follow up. Plaintiff V.A. also attempted to make a complaint in person on numerous occasions but was turned away without assistance.

198.    This failure to investigate or discipline officers is one of the driving forces in the widespread policy of failing to provide language access. Officers who know they will not be investigated or held accountable for failing to provide language access believe that they are free to provide access or not based on their own whim.

199.    In failing to investigate or discipline officers for failing to provide language access, Defendants NCPD and Nassau County were deliberately indifferent to the constitutional rights of those with limited English proficiency in Nassau County.

200.    The failure to discipline officers is the direct and proximate cause of the harm suffered by Plaintiffs.

*Failure To Screen*

201.    Defendants have failed to make reasonable efforts to recruit or hire officers or staff who are proficient in Spanish and who could therefore improve NCPD's ability to provide language access to those who request or need it.

202.    Instead, NCPD allows officers and employees to self-certify their fluency in Spanish.

203.    It does not screen officers who claim they are fluent in Spanish to determine whether or not they really are. Instead, NCPD simply counts any officer who states he or she is fluent as a Spanish-speaking officer.

204.    Combined with the overwhelming racial disparity of NCPD—which is nearly 90% white but polices a population that is over 40% non-white—this failure to screen results in fewer officers who are able to speak Spanish, and therefore lowers compliance with even the minimal standards set forth in the Plan.

205.    NCPD fails to screen officers for Spanish fluency, and allows officers to self-certify as fluent in Spanish, because it is deliberately indifferent to the rights of LEP residents of Nassau County.

206.    NCPD's hiring practices are made in reckless disregard of the rights of LEP residents of Nassau County.

207.    NCPD's failure to screen hires for Spanish fluency, and its failure to certify that those officers who claim they speak Spanish actually do so, are the direct and proximate causes of Plaintiffs' injuries.

**SIXTH CAUSE OF ACTION**
**New York State Constitution, Article I, Section 11**
**Equal Protection**

208.    Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

209.    Defendants denied Plaintiffs equal access to the services and protections of NCPD based on their national origins.

210.    Article I, Section 11 of the New York State Constitution provides that "No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state."

211.    By failing to require that its officers provide language access to those who request or need it, Defendants have denied Plaintiffs and class members equal protection of the laws based on their race and national origin.

212.    Such discrimination violates the Equal Protection Clause of the New York State Constitution.

213.    As a direct and proximate result of Defendants' failures, Plaintiffs have suffered injuries and damages.

**SEVENTH CAUSE OF ACTION**
**28 U.S.C. § 2201**
**Declaratory Judgment**

214.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

215.    Pursuant to 28 U.S.C. § 2201, Plaintiffs seek a declaratory judgment that NCPD's language access policies, as actually implemented, fail to provide language access to those in Nassau County who need or request it.

216.    Pursuant to 28 U.S.C. § 2201, Plaintiffs seek a declaratory judgment that NCPD's language access policies, as actually implemented, violated Plaintiffs' and class members' rights under the U.S. Constitution, Title VI of the Civil Rights Act of 1964, and the New York State Constitution.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request that a judgment be entered in their favor and that the Court order and award the following relief:

A.    Issue a declaratory judgment that the actions, conduct and practices of Defendants set forth above violated Plaintiffs' rights under the U.S. Constitution, Title VI of the Civil Rights Act of 1964, and the New York State Constitution;

B.    Issue an order imposing a federal language access monitor on NCPD to evaluate its true compliance with the order of the Court and the requirements that NCPD provide language access to LEP individuals as required by federal, state, and local law. The term of the federal monitor shall depend on NCPD's establishing and continuing compliance as determined by the monitor and the Court. The monitor shall be selected by the Court at the conclusion of a public application process;

C.    Issue an order imposing a federal Internal Affairs monitor on NCPD to evaluate its Internal Affairs Unit and report to the Court any deficiencies that contributed to the constitutional

violations. The term of the federal Internal Affairs monitor shall depend on NCPD's establishing and continuing compliance as determined by the Internal Affairs monitor and the Court. The Internal Affairs monitor shall be selected by the Court at the conclusion of a public application process.

D.      Issue an order requiring NCPD to abide by laws and policies requiring the provision of interpreter services or other language access services to those who request or need them;

E.      Issue an order requiring NCPD to refrain from unlawful treatment of LEP and foreign-born individuals;

F.      Issue an order that NCPD institute and implement policies and programs with respect to the provision of interpreter services and treatment of foreign-born and LEP communities that comply with all legal requirements, to be evaluated and reported by the language access monitor to the court on a regular basis;

G.      Issue an order requiring NCPD to establish a system for tracking and monitoring NCPD practices regarding the use of interpreter services, including failures to use interpreter services;

H.      Issue an order requiring NCPD to institute measures to ensure compliance regarding language services, including ongoing documentation of requests for the provision of interpreter services and the responses to those requests by NCPD officers.

I.      Issue an order requiring NCPD to develop and implement appropriate training for members of the NCPD regarding treatment of LEP and foreign-born communities including when to provide an interpreter, how to properly work with interpreters, sensitivity training, and cultural competence;

J.      Issue an order requiring NCPD to develop appropriate supervisory procedures regarding the treatment of foreign-born and LEP communities and the provision of interpreter services to LEP individuals;

K.      Issue an order requiring NCPD to implement a system of reporting to the Plaintiffs and the Court regarding the steps taken to cure the violations of the Plaintiffs' and other LEP individuals' rights.

L.      Establish an entity independent of NCPD to review, investigate, and prosecute allegations that NCPD officers failed to comply with NCPD policies, including but not limited to those regarding the provision of language access.

M.      Order Defendants to pay reasonable costs and attorneys' fees to the Plaintiffs; and

N.      Grant any other relief the Court deems just and proper.

Respectfully submitted this 17th day of July, 2023.

_____*/s/ Meena Roldán Oberdick*_____
Fulvia Vargas-de Leon, Senior Counsel
Meena Roldán Oberdick, Associate Counsel
Andrew Case, Supervising Attorney
LatinoJustice PRLDEF
475 Riverside Drive #1901
New York, NY 10115
212-219-3360
fvargasdeleon@latinojustice.org
moberdick@latinojustice.org
acase@latinojustice.org
*Attorneys for Plaintiffs*