# EXHIBIT 6

# Unprotected and Unheard: Nassau County Police Department Fails Immigrant Communities

*2022 Language Access Testing Report*

**Conducted by**

**New York Immigration Coalition (NYIC)**

**&**

**Long Island Language Advocates Coalition (LILAC)**





1

In 2013, in response to community pressure to address the needs of a growing and linguistically diverse immigrant population, and shortly after Hurricane Sandy had devastated many local families, former Nassau County Executive Ed Mangano signed language access Executive Orders 67 and 72. The Executive Orders mandated language access at all public facing county agencies, including the Nassau County Police Department (NCPD) whose services are essential to the safety and well-being of our communities. After years of local and statewide language access and police reform efforts, NYIC and LILAC partnered to conduct this testing project to evaluate the NCPD's current language access practices. Our findings indicate a significant failure rate in the NCPD's response to Spanish speakers who called the eight precincts and headquarters a total of 94 times seeking basic information. Our recent testing had a failure rate of *46.8%* indicating a pattern of willful negligence and dereliction of duty. After nine years of being mandated to comply with the local executive orders, and far more years of being mandated to comply with its federal civil rights obligations, the NCPD has failed to adequately protect and serve our immigrant population, particularly those who are Limited English Proficient. We conclude that lessons to be learned necessitate increased oversight and accountability as well as a deliberate cultural shift in honoring language access rights and improving police services rendered to all Limited English Proficient members of our community.

# TABLE OF CONTENTS

| | |
|---|---|
| TITLE PAGE | 1 |
| ABSTRACT | 2 |
| TABLE OF CONTENTS | 3 |
| ACKNOWLEDGEMENT | 4 |
| WHO WE ARE | 5 |
| INTRODUCTION | 5 |
| WHAT IS LANGUAGE ACCESS? | 6 |
| LANGUAGE ACCESS IS REQUIRED BY FEDERAL LAW | 6 |
| LANGUAGE ACCESS IN NASSAU COUNTY | 7 |
| THE NEED FOR LANGUAGE ACCESS | 8 |
| NCPD DOES NOT REFLECT THE COMMUNITY IT SERVES | 11 |
| 2022 TESTING STUDY | 12 |
| RESULTS | 12 |
| TESTER ANECDOTES | 14 |
| POLICY RECOMMENDATIONS | 17 |
| CONCLUSION | 18 |
| REFERENCES | 20 |
| A Timeline of Language Access Advocacy in Nassau County | 22 |

## ACKNOWLEDGEMENT

Thank you to the New York Immigration Coalition and Long Island Language Advocates Coalition for sponsoring  this study.

We would like to thank the seven volunteer callers for their assistance in this study.

Thank you to Charles Banyai, Susan Gottehrer, Cheryl Keshner, Ivan Larios, Karen Tejada, and Peter Zayas, Ph.D. Student, for their contributions in preparing this report.

A special thank you to all immigrants of Nassau County who work to improve the community and put their faith in us to advocate on their behalf.

4

## WHO WE ARE

The New York Immigration Coalition (NYIC) is an umbrella policy & advocacy organization that represents over 200 immigrant and refugee rights groups throughout New York. Since its founding in 1987, the NYIC has evolved into a powerful voice of advocacy by spearheading innovative policies, promoting and protecting the rights of immigrant communities, improving newcomer access to services, developing leadership and capacity, expanding civic participation, and mobilizing member groups to respond to the fluctuating needs of immigrant communities. The New York Immigration Coalition envisions a New York State that is stronger because all people are welcome, treated fairly, and given the chance to pursue their dreams.

The Long Island Language Advocates Coalition (LILAC) is composed of advocates from a diverse group of community based organizations serving low income Long Islanders. LILAC has been working since 2010 to ensure that Long Islanders who do not read, write, speak or understand English proficiently receive equal access to all programs and services, such as healthcare, law enforcement, social services and justice through the courts. We work to ensure that all are treated with dignity, and do not face discrimination based on their ability to communicate in English, their disability, or immigration status. LILAC  was instrumental in gaining passage of the 2012 and 2013 Suffolk and Nassau Executive Orders on language access and has worked to secure their proper implementation ever since. We fully support the movement for genuine police reform, transparency, oversight and accountability.

## INTRODUCTION

This research provides comprehensive data gathered by volunteers conducting testing calls to the Nassau County Police Department (NCPD) to assess its language access performance. For years, there have been numerous efforts by community advocates to address language access deficiencies within the department. This report is only one small part of this ongoing effort. Its purpose is to provide a snapshot of  the most recent testing done by NYIC and LILAC. In effect, what the report shows is that time and again NCPD is consistently in violation of language access rights and responsibilities. The law and order agency is failing to comply with federal and county level mandates to the detriment of Limited English Proficient (LEP) community members. Despite numerous rounds of testing over the years to track NCPD's progress, our conclusions reveal similarly disturbing patterns that show providing language access to the public is haphazard at best, and ignored at worst. Despite past efforts to encourage the NCPD to take action, a lackluster response consisting of broken promises and radio silence reveal a culture of willful negligence that permeates within the department. Even recent calls for police reform,

5

accountability and addressing bias, as outlined by The People's Plan[1], have not motivated NCPD to prioritize fair and just language access for each resident. Therefore, we urge the police department to, once again, adopt our recommendations of diverse hiring, culturally competent training, and increased accountability in order to advance language justice in Nassau County. Failure to do so shows NCPD puts lives at risk, ignores its legal obligations, and is complicit in actively allowing bias to dictate department protocol.

## WHAT IS LANGUAGE ACCESS?

Language access ensures that people who may not be proficient in English, or who experience sensory challenges, receive timely and meaningful access to programs and services in their preferred language, particularly when those programs are recipients of federal funding. Pursuant to federal law, healthcare providers, courts, social services, educational institutions and law enforcement departments are among those mandated to provide language assistance. Interpretation (or oral language assistance) may be provided by fully bilingual staff or by trained and competent interpreters in person, or by phone or through video relay. Translation of vital written documents is also an essential component of providing language assistance. This includes conveying information in writing about essential services to the public in their native language or the translation of requests for assistance from an individual's source language into English.

## LANGUAGE ACCESS IS REQUIRED BY FEDERAL LAW

> "No person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."
>
> (Title VI of the Civil Rights Act of 1964, Sec. 601: Non-Discrimination in Federally-Assisted Programs)

- The Civil Rights Act of 1964 enshrined into law historic protections for many people living in this country who have historically faced discrimination, including those excluded from participation in federal programs based on their actual or perceived national origin.

---

[1] See People's Plan that was included in broader calls for police reform: https://www.liunited.org/the-peoples-plan

6

- In 1974, the Supreme Court found that  failure to provide language access  by any recipient of federal assistance is a form of national origin discrimination (Lau v. Nichols, 414 U.S. 563, 5).
- In 2000, President Clinton issued Executive Order 13166, further clarifying and reinforcing the language access responsibilities of federally funded agencies and their grantees and requiring them to develop a plan for providing language assistance to the communities they serve.

## LANGUAGE ACCESS IN NASSAU COUNTY

- In 2012 and 2013, grassroots pressure mounted to improve language access in Nassau County.
- In January 2013, the Nassau County Police Department entered into an agreement with the New York State Attorney General to provide improved language assistance to Nassau's Limited English Proficient population, as already required by federal law. "Access to our state's justice system should not depend on the ability to read or write English, or be compromised by language barriers,"  stated then-Attorney General Schneiderman.
- In July and August of 2013 Executive Orders 67 and 72, were signed by County Executive Mangano which required every Nassau County agency providing direct public services to adhere to the following 'best practices':[2]

| Designate a language access coordinator and develop a language access plan | Maintain a list of County employees who are proficient in a variety of languages | Train and instruct employees periodically on how to access interpretation services | Translate websites using a reliable translation source |
| --- | --- | --- | --- |

---

[2] Despite changes in  Nassau  County  administration, Executive Orders 67 and 72 remain in effect and must be seriously implemented and enforced.

| | | | |
|---|---|---|---|
| **Inform the public of the availability of language services through proper signage and other means** | **Provide competent bilingual employees or interpreters in any language necessary for telephonic or in-person encounters** | **Translate vital documents into the six most frequently used languages (Spanish, Haitian Creole, Farsi, Simplified Chinese, Korean and Italian) in Nassau County** | **Annually collect data on the provision and availability of interpreter services and Monitor agency compliance** |

> **County agencies are explicitly prohibited from using the request for language assistance as a basis to inquire about immigration status.**
>
> **-Nassau County Executive order 72-2013**

*We insist that the new administration of Nassau County implement and enforce*

*Executive Orders 67 and 72.*

## THE NEED FOR LANGUAGE ACCESS

Over the past thirty years, Nassau County has seen a significant increase in its immigrant population. Many have immigrated to the United States seeking educational or financial opportunities, and are often escaping dangerous conditions in their home countries. Immigrants contribute significantly to the fabric of our communities and to our local economy.[3] Like all members of our community. They deserve to feel safe and well protected and be able to access services without facing communication barriers.

The population is both culturally and linguistically diverse, and, while some may speak English proficiently, others, particularly those who are newly arrived, may have difficulty communicating in English, especially during times of crisis. According to the 2020 American Community Survey (see Chart 1), Nassau County experienced an increase in

---

[3] https://fiscalpolicy.org/wp-content/uploads/2015/06/Immigrants-2015-full-report1.pdf

Asian and Latin American populations, while the inverse is true for European immigrants.

This research project was conducted by bilingual Spanish-speaking volunteers. We reference a second chart (see Chart 2) that shows the Spanish speaking residents' need for language access in Nassau County.  Next to English, Spanish is the most often used language in the county.  Residents indicating that they speak English "less than very well"  would most likely need language assistance. While our testing was only conducted in Spanish due to the proficiency of our volunteers, we recognize that language access is absolutely essential for all members of our community.



Source: Information taken from the 2020: American Community Survey (ACS) 5-Year Estimates, 2010: ACS 1-Year Estimates, 2000: DEC



Source: Information taken from the 2020: American Community Survey (ACS)

Graphs and numbers only tell a small part of the story. Interactions which involve the police, such as a natural disaster, a health crisis, or a traffic stop, or when the individual has been the victim of a crime or has been arrested, may prove particularly challenging for people who are Limited English Proficient.  It is the responsibility of the police to be able to fully communicate with all members of the public in these situations. When police do not properly address communication barriers, they place the lives of our LEP community members, particularly people of color, in jeopardy. Further miscommunications may also lead to Immigration and Customs Enforcement [ICE] involvement, leading to deportation. Black and Brown immigrants are also frequently subject to racial profiling and increased contact with law enforcement.[4] Individuals who are in crisis are frequently retraumatized in their interactions with the police. The following stories reflect recent experiences shared with advocates by community members:

---

[4] See Morgan et al. 2016

10

February 2022: A Spanish speaking tenant who had been illegally evicted contacted 911 to request assistance. The responding NCPD officer did not provide an interpreter, but instead, only noted the side of the story which was provided by the English speaking daughter of the landlord. The tenant was left without heat, hot water and gas, which posed a danger to this family, which included a 5-year-old and a 1-month-old. Since the police failed to provide an impartial interpreter, the officers were not aware that the landlord continued to make threats during the conversation to the tenant and her family and did not address the crisis effectively.

August 2021: A victim of domestic violence sought assistance in making a police report at a Nassau community agency. She had strangulation marks on her neck and other noticeable signs of abuse. The NCPD was contacted, but did not respond for hours. Once they did show up, officers treated the victim rudely, refused to modify a prior report, threatened to arrest her, and did not provide an interpreter for hours. Subsequent to this incident, LILAC reached out to advocates at a local domestic violence agency serving the Latino community. They also reported similar longstanding patterns with the police.

July 2020: A community member who was being harassed by her landlord contacted NCPD's 5th Precinct for assistance. When the responding officer showed up, she asked for help in Spanish. The officer said, "No translator. This is America. We speak English here." The woman felt ignored, disrespected and did not feel her dangerous situation was properly addressed. A complaint was filed with the NCPD, but no response was received.

- All of these individuals were retraumatized in their interactions with the NCPD and felt that they could not trust the police to protect them.
- Language access saves lives, ensures equity, accommodates all who are members of our communities, and it is an important step to safeguard justice.

## NCPD DOES NOT REFLECT THE COMMUNITY IT SERVES

The Nassau County Police Department is composed of 2,500 officers as well as numerous auxiliary police personnel. The NCPD is the twelfth largest municipal law enforcement agency in the United States. While just under 40% of Nassau County's population identifies as a race other than Caucasian, members of the police force that identify as either Black, Latino, Asian or "other" comprise only 13.2% of the department.

Despite a 40- year old federal directive by the Department of Justice to diversify the department, the NCPD does not reflect the diversity of the community it serves.[5]

In its 2020 Language Access Plan, the NCPD does not indicate the number of officers who are considered proficient in a language other than English. The plan states:

*The Department utilizes Department Interpreters who are proficient in secondary languages and capable of providing interpretation and translation services to an LEP person. Members indicate their proficiency in an Employee Skills Inventory Sheet.*

## 2022 TESTING STUDY

In January 2022, the study's sponsors, The New York Immigration Coalition and the Long Island Language Advocates Coalition, embarked on a joint campaign to test the language accessibility of the Nassau County Police Department. The 2022 LANGUAGE ACCESS TESTING STUDY provided training and technical support for potential volunteers. The volunteers were instructed to call police precincts (a total of 8) and police headquarters in Nassau County and ask for specific information in a language other than English. Testers used a script and were able to choose one of nine questions. Each caller sought assistance with matters such as how to obtain fingerprints, how to get a police report, or when they could take the next police officer exam. These basic questions were designed to assess whether the Nassau County Police Department would accommodate non-English speaking callers in a timely and professional manner, either by connecting the caller to bilingual personnel or through the use of professional telephonic interpretation services, such as Language Line.

## RESULTS

In total, ninety-four calls were made in the "2022 Language Access Testing" by seven bilingual testers, all requesting information in Spanish. Calls were made at various hours, from 9:20 a.m. to 10:42 p.m., between February 1st and April 18th, 2022. Our findings indicate that out of the 94 calls made, testers were unable to obtain language assistance or get the requested information 44 times, indicating a **46.8%** failure rate.

---

[5] See
https://www.cbsnews.com/newyork/news/nassau-county-police-suffolk-county-police-diversity-white/

## Calls that did not receive language assistance (n=44)



- The call got disconnected while transferring
- The caller was intentionally hung up on
- The caller was never connected to someone who spoke their language
- The call was never answered
- The answering officer could not provide an answer

**Out of the eight calls made to police headquarters none of the testers were provided with help in the language requested.**

In the next chart, we indicate that fifty calls (53.2%) did receive language assistance. In the majority of these cases, the caller was transferred to a Language Line interpreter. Some other callers were properly connected to a bilingual officer.

## Calls that received language assistance (n=50)



- The caller was connected with Language Line
- The caller was transferred to bilingual NCPD personnel
- The answering officer fluently spoke the caller's language

The last chart indicates the calls that were successful versus the calls that were failures based on precincts. Notably, precincts 2 and 6 provided far more language assistance compared to any of the others, including police headquarters.



Total calls made to each precinct vs. calls where precinct was unsuccessful in providing assistance

**TESTER ANECDOTES**

      **Testers noted their experience on a spreadsheet and provided comments regarding their experiences. In this section, we provide some  of the testers' observations, both positive and negative.**

10:43 AM 2/03/2022  Fourth Precinct.  The answering officer did not speak Spanish and transferred the tester to another officer who only spoke very limited Spanish, but attempted to act as an interpreter. The tester was transferred to multiple English-speaking officers, some of whom seemed frustrated  having to deal with a caller who did not speak English. These officers kept telling the tester to come into the precinct. After 12 minutes, an officer called an interpretation service line and the tester was able to have their questions answered. The total call time was 14 minutes.

11:48 AM 2/08/2022 First Precinct. The tester was transferred to an interpretation service and after 2 minutes was connected with an interpreter. However, the answering officer

hung up on the call leaving the tester alone with the interpreter and unable to ask their questions. The total call time was 5 minutes.

 1:25 PM 2/08/2022   Seventh Precinct.   The answering officer said he did not speak Spanish and instructed the tester – in English– to call 911 if it was an emergency. The answering officer was rude and  hung up on the caller.  Total call time was 2 minutes.

1:05 PM 2/09/2022  Seventh Precinct. The answering officer did not speak Spanish and never offered to connect the caller to an interpreter despite the Spanish speaking caller repeatedly telling the officer that they did not speak English. The answering officer  was rude, told the tester to dial 911, and then hung up on the caller. Total call time was 1 minute.

2:10 PM, 2/10/2022 Fourth Precinct. The answering officer kept saying "No habla español" and then rudely hung up on the tester. Total call time was 2 minutes.

8:08 PM 2/10/2022  Third Precinct. The answering officer told the tester he would connect them to an officer who spoke Spanish, but after being on hold for 9 minutes, the tester hung up. Total call time 10 minutes.

 8:28 PM 2/10/2022 Seventh Precinct. The answering officer connected the tester to an interpreter after a 2-minute wait, however, the interpreter was unable to hear the tester due to a technical issue. Total call time was 10 minutes.

11:11 AM 2/18/2022 Headquarters. After the call was  answered, the tester got disconnected. Although the tester was unsure if they had  gotten disconnected or deliberately hung up on,  the call was counted as a  disconnect.  Total call time: 1 minute.

4:36 PM 2/17/2022 Seventh Precinct. The tester never was transferred to the Language Line or a bilingual officer. The answering officer ,who only spoke English. kept asking for the tester's address and phone number.  Total call time was 9 minutes.

9:13 AM 3/04/2022 Fifth Precinct.  Answering officer only spoke to the caller in English and never offered an interpreter or transferred the tester to a bilingual officer. Officer told the tester to call 911. The call was then either disconnected or the tester was hung up on. The tester counted the call as being disconnected.  Total call time: 1 minute.

15

8:21 PM  2/10/2022 Fifth Precinct.  The answering officer did not speak the tester's language but transferred the caller to a bilingual officer who was very polite and answered all of the testers' questions.  Total call time 4 minutes.

1:38 PM 3/09/2022  Second Precinct. The answering officer did not speak the tester's language, but connected the tester to an interpreter after a two minute wait and was able to answer all questions.  Total call time was 10 minutes.

8:26 PM 2/10/2022 Sixth Precinct.  The answering officer spoke the tester's language and was able to provide assistance..  The answering officer was very polite.  Total call time was 1 minute.

## SUMMARY OF FINDINGS

1. Several officers did not know how to connect the caller to a telephonic interpreter. Testers heard officers being instructed by their co-workers on how to use Language Line.  Often the calls were disconnected.

2. Some officers appeared to not understand that the purpose of Language Line was to provide interpretation and that they still needed to remain on the line to communicate with the caller. On one occasion, the tester was left alone with the interpreter and unable to ask their question to the officer.

3. Some officers did not even attempt to connect the tester to an interpreter when it was clearly needed, and did not recognize their responsibility to do so.

4. On eight occasions, NCPD personnel did not pick up the telephone, and the phone just rang continuously until the testers eventually hung up.

5. On 7 occasions testers were told in English by answering NCPD personnel to call 911 and then were promptly hung up on (see anecdotes 3, 4, and 10).

6. On several occasions testers were asked repeatedly if they spoke English and were hung up on when they responded "no".

7. On those occasions where the answering officer spoke the testers language the answering officer was quick and professional with answering the caller questions.

8. Some callers were kept waiting up to 10 minutes or longer (see anecdotes 1, 6, and 7).  Other testers were kept on hold indefinitely and never received a response.

9. In some cases, callers felt intimidated by officers who insisted that the caller give them their personal information or that they had to appear in person at the precinct to receive services (see anecdotes 1, and 9).

16

10. On some occasions, testers were continuously transferred between personnel who did not speak the language instead of connecting them with the Language Line.

11. On some occasions, officers who spoke Spanish poorly perceived themselves to be sufficiently fluent in the tester's language instead of connecting them to the Language Line.

12. In all eight calls that testers made to headquarters, none of the testers were able to receive language access assistance.

13. When testers received help from bilingual officers, they reported more positive interactions.

> HAD ANY OF THE 44 CALLS WHERE LANGUAGE ASSISTANCE WAS NOT PROVIDED BEEN AN ACTUAL EMERGENCY, THE RESULTS COULD HAVE BEEN DISASTROUS.

## POLICY RECOMMENDATIONS

Based on our testing, it is clear that there must be significant change within the Nassau County Police Department. After years of making these recommendations, they were forwarded again in the People's Plan for police reform in 2021, and were rejected. We recommend the following reforms finally be adopted:

**Hiring**
- We recommend hiring personnel who are culturally, racially, and linguistically diverse, reflecting the demographics of Nassau County. In this way, the police department will better respond to the needs of all community members including those who are Limited English Proficient.
- NCPD needs to diversify the department, as directed by the NYS Attorney General in 2013 and post information regarding demographics of the department and what measures are being taken to diversify and recruit people of color, women and speakers of languages other than English.
- NCPD must assign a dedicated language access coordinator whose duties are clearly delineated in the Department's Language Access Plan. This individual must receive support in order to do his/ her job effectively and not be expected to also assume the duties of a domestic violence liaison, as is currently the practice.

**Training**
- A comprehensive language access training must be developed in collaboration with language access experts, advocates and impacted community members. NCPD needs to partner with a reputable organization, and provide training to all personnel on an

17

annual basis. Content of the training should be shared with the public. We recommend the training be done in-person, and in a  supervised classroom setting.

- Departmental personnel must not be permitted to self-assess their language skills. An independent assessment must be conducted and standards established and upheld to ensure  quality interpretation and translation is provided.
- The Department needs to reestablish a certification program, which has been inactive for years, to train Department authorized interpreters. Incentives need to be established for those who wish to participate in this training program.

**Accountability**

- The Nassau County Executive, and the Nassau County Legislature must ensure accountability and provide oversight to ensure that  language access is meaningfully implemented in  the NCPD.
- The Nassau County Executive Orders on language access should be strengthened by the  Nassau County Legislature and codified into law.
- Internal audits must be conducted to assess where and when language access is/ is not being provided whether at the precinct, headquarters or on the field.
- Data regarding Language Line usage must be maintained per precinct and division and posted prominently on the NCPD website on a quarterly basis. This includes frequency of  interpretation provided in all settings, including traffic stops.
- Personnel who consistently do not provide language assistance must be disciplined and held accountable for their actions.
- NCPD's language access plan must be publicly posted to their website and translated into all required languages.
- The NCPD must restore its website's posting of their April 1, 2021 police reform plan.
- NCPD's language access plan must be significantly improved, outlining proper procedures, prohibiting the use of children as interpreters, and delineating the responsibilities of all personnel, including the language access coordinator.

## CONCLUSION

Over the years, the Nassau County Police Department (NCPD) has repeatedly been informed of the department's language access deficiencies, yet has failed to take action to correct them.  These repeated violations demonstrate a pattern of willful negligence and discrimination based on national origin. We urge the New York State Attorney General to take further steps to ensure the NCPD is in compliance with its civil rights responsibilities. We also call upon  the U.S. Department of Justice to step in,  to investigate the NCPD's patterns and practices of discriminatory policing, which are in violation of federal law, to hold the department responsible, and to impose sanctions as necessary.  The NCPD needs new leadership that is effective, unbiased, and prioritizes language access.

We recognize that language access is just one piece of a much larger problem within the Nassau County Police Department, which results in the disproportionate targeting of community members of color. The NCPD is choosing to reinforce biased policing practices. The NCPD will never establish trust with marginalized communities until they fundamentally change the culture within the department, provide effective leadership, address internal bias, improve community relations, and ensure accountability and transparency.

**How many more years must  Nassau County residents wait for fundamental change and justice?**

**How many more lives will be lost or placed in peril?**

# We deserve better!

# REFERENCES

American Community Survey. (2020). *DP02 SELECTED SOCIAL CHARACTERISTICS IN THE UNITED STATES*. Explore census data. Retrieved July 20, 2022, from https://data.census.gov/cedsci/table?g=0500000US36059&y=2020&d=ACS+5-Year +Estimates+Data+Profiles&tid=ACSDP5Y2020.DP02

American Community Survey. (2010). *DP02 SELECTED SOCIAL CHARACTERISTICS IN THE UNITED STATES 2010: ACS 5-Year Estimates Data Profiles*. Explore census data. Retrieved July 20, 2022, from https://data.census.gov/cedsci/table?g=0500000US36059&y=2010&d=ACS+5-Year +Estimates+Data+Profiles&tid=ACSDP5Y2010.DP02

Decennial Census. (2000). *DP2 Profile of Selected Social Characteristics: 2000 2000: DEC Summary File 3 Demographic Profile*. Explore census data. Retrieved July 20, 2022, from https://data.census.gov/cedsci/table?g=0500000US36059&y=2000&tid=DECENNI ALDPSF32000.DP2

Exec. Order No. 67-2013, pages 1-2 (July 30, 2013)

Exec. Order No. 72-2013, pages 1-2 (August 15, 2013)

Fiscal Policy Institute. (2015, June). *New Americans on Long Island - fiscal policy*. Retrieved July 20, 2022, from http://fiscalpolicy.org/wp-content/uploads/2015/06/Immigrants-2015-full-report 1.pdf

LILAC. (2015, August). *Language Access Denied: Ed Mangano's Broken Promise to Nassau County*. Empire Justice Center. Retrieved July 20, 2022, from https://empirejustice.org/wp-content/uploads/2017/12/language-access-denied.p df

Long Island United to Transform Policing and Community Safety, et. al. (2021). The People's Plan. Retrieved July 20, 2022 from, https://www.liunited.org/the-peoples-plan

Long Island Wins. (2016, June 20). *A shocking account of Nassau County's language access failures*. Long Island Wins. Retrieved July 20, 2022, from https://longislandwins.com/news/a-shocking-account-of-nassau-countys-language -access-failures/

Morgan-Trostle, Juliana, Kexin Zheng, and Carl Lipscombe. *"The State of Black Immigrants. Black Alliance for Just Immigration and NYU School of Law Immigrant*

*Rights Clinic.*" www.immigrationresearch.org, September, 2016. http://www.stateofblackimmigrants.com/assets/sobi-fullreport-jan22.pdf

Nassau County Police Department. (2020). Nassau County Police Department Language Access Plan 2020. Retrieved July 20, 2022, from https://www.nassaucountyny.gov/DocumentCenter/View/30710/County-Wide-LAP-2020-?bidId=

Unknown. (2021, June 3). *New report shows Long Island's police departments are still overwhelmingly white despite efforts to diversify ranks.* CBS News. Retrieved July 20, 2022, from https://www.cbsnews.com/newyork/news/nassau-county-police-suffolk-county-police-diversity-white/

Vera Institute of Justice. (2022, May). Police Data Transparency Index. Retrieved July 20, 2022, from https://policetransparency.vera.org/

# A Timeline of Language Access Advocacy in Nassau County

**2013 Jan** — NCPD agreement with NYS Attorney General to diversify the department & improve language access

**2013 Feb** — Advocates initiate discussion with the Nassau County Executive Office re: Language Access

**2013 July** — Nassau County Executive signs EO 67 but it is FAR from what is needed/agreed upon

**2013 Aug** — After a phone call campaign and meetings, EO 72 is signed: Interpreters at County agencies and translation of vital documents.

**2014 Jan** — LILAC submits a detailed list of concerns to Nassau County Dept of Social Services. Implementation is an issue!

**2014 Jun** — Nassau County DSS shares language access plan. Advocates share suggestions to make it stronger.

**2014** — The County Executive responds saying concerns will be address thru implementation of the EOs.

**2014 Jul** — A community forum on Language Access is held. 75 people. Nassau County Police Chief attends, no one from Mangano administration.

**2014 Aug** — Testing of key county agencies. Find noncompliance with Language Access responsibilities. County issued a failing grade at press conference.

**2014** — Advocates launch a massive postcard campaign to urge Mangano to keep his promise to the community.

**2014** — Mangano is issued a report card with a failing grade.

**2014** — Advocates request a meeting with the County Executive to talk about implementation, but are refused.

**2014** — Following a massive postcard campaign, organizers meet with County Attorney instead and are told the Eos are being "phased in."

**2014 Sep** — A Freedom of Information Law request is sent to Nassau County Attorney asking for information re: Language Access.

**2014 Oct** — Advocates organize a rally and present the County Executive with hundreds of signed postcards supporting Language Access.

**2014** — Advocates demand a meeting with the Executive, but are instead met by staff, who promise meeting with Mangano.

**2014** — Advocates are able to meet with County Attorney and Dir of Minority Affairs, who said EO's are "phasing in." No timeline is provided.

**2014 Dec** — Foil responses are received, including NCPS and DSS Language Access plans, and reports on calls to Mangano re: Eos.

**2015 Apr** — Advocates once again test County agencies. Find serious deficits in Language Access.

**2015 Jun** — Democratic Legislators sign on to a letter of support for implementation of EO 67 & 72. Letter sent to County Executive.

**2015** — Community advocates and members speak before the Nassau County Legislature asking them to support Language Access.

**2015** — Advocates raise concern about a possible DOJ investigation.

**2015 Jun** — Advocates meet with the NYS Attorney General's Office to talk about testing results for NCPD.

**2015 Jul** — Advocates do additional testing of County agencies, including NCPD. Find significant noncompliance.

**2015 Aug** — Advocates plan a multi-agency action day marching from Dept of Health to County Executive's office.

**2015** — Advocates meet with NCPD, who promise significant changes.

**2015** — LILAC issues report, Language Access Denied, and details Mangano's failure to implement EO 67 & 72.

**2015** — NCPD appoint a language access coordinator

**2015** — In response to testing, NY State Attorney General contacted the NCPD to remind the Dept of its legal obligations to provide language assistance.

**2015** — NCPD conducts internal audits. Language Access coordinator leaves the dept. Commitment to improve is tenuous.

**2016** — NCPD conducted internal audits in cooperation with advocates speaking Haitian Creole and acknowledge problems.

**2017** — Advocates continue to meet with NCPD regarding immigration policies.

**2017** — NCPD Language Access Coordinator appointed, but later reassigned.

**2017** — Additional testing of NCPD conducted by advocates.

**2017** — In response to our testing, the police commissioner worked with advocates to conduct internal testing calls, including in Haitian Creole.

**2017** — By his own admission, internal testing results were extremely unsatisfactory

**2018** — Advocates presented results of language access testing to commissioner Ryder. Agrees to meet monthly to work on issues. No further meetings occur.

**2018** — Advocates meet with County Executive Curran regarding testing results.

**2019** — LILAC raised language access concerns with police commissioner, only to be summarily ejected from a meeting.

24

**2019** — A follow-up letter sent with suggested improvements and no response received.

**2020** — Testing anecdotes shared with Office of the NYS Attorney General which demonstrate many of the dismissive/unprofessional responses.

**2020** — Testers indicate a pattern of unacceptable behavior and lack of proper training and supervision.

**2020** — Spurred by the death of George Floyd, the police reform movement emerges.

**2020** — NCPD, the County Executive, and the majority of the Nassau County Legislature reject community input and reforms.

**2020** — People's Plan: Change the police culture, transparency, accountability, improve procedures and policies.

**2021 Feb** — People's Plan submitted to Governor Cuomo

**2021** — Governor Cuomo mandated that police departments come up with reform plans per EO 203

**2021** — People's Plan issued by broad coalition to address disparities in policing practices. NCPD rejects proposed changes.

**2021 Mar** — Nassau County Legislature approved the county's proposed police reform plan.

**2021** — Plan did not contain recommendations for additional accountability (i.e. civilian review boards, inspector general) re: police misconduct.

**2021** — The opposition came from three Black Legislators who called upon the NYS Attorney General to provide additional oversight of NCPD.

**2021 Nov** — LILAC meets with Commissioner Ryder re: domestic violence & LEP community members. LILAC provides recommendations

**2021** — No follow-up from NCPD. Requests for meetings and documents are ignored.

**2022 Jan** — County Executive takes office.

25



**2022**

Commissioner Ryder provided a police reform progress report to the Nassau County Legislature which demonstrated racial bias in policing.

**2022**

New York Civil Liberties Union sues NCPD for refusing to give access to police disciplinary records.

**2022**

NCPD issues a 1-year report on police reform.

**2022: LILAC/NYIC conduct large scale language access testing study.**

Letter to Attorney General
https://ag.ny.gov/sites/default/files/pdfs/bureaus/civil_rights/agreements_complaints/Nassau%20Co%20Police%20Department%20-%20Language%20Access%20Agreement.pdf

Executive Order 67
https://www.longislandlanguageadvocates.org/uploads/7/4/7/5/7475975/executive-order-67.pdf

Executive Order 72
https://www.longislandlanguageadvocates.org/uploads/7/4/7/5/7475975/executive-order-72.pdf