**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CENTRAL AMERICAN REFUGEE CENTER, LONG ISLAND LANGUAGE ADVOCATES COALITION, E.B., M.C., and V.A., on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>NASSAU COUNTY, NASSAU COUNTY POLICE DEPARTMENT, and PATRICK RYDER, in his official capacity as Commissioner of Nassau County Police Department, OFFICER JOHN DOE, head of the Internal Affairs Unit of the Nassau County Police Department, and SERGEANT SABRINA GREGG, Nassau County Police Department Language Access Coordinator,<br><br>*Defendants*. | Case No. 2:23-cv-05412-NJC-ALR<br><br>**PLAINTIFFS' ~~FIRST~~SECOND AMENDED CLASS ACTION COMPLAINT** |

Plaintiffs CENTRAL AMERICAN REFUGEE CENTER – CARECEN (NY), LONG ISLAND LANGUAGE ADVOCATES COALITION, E.B., M.C., and V.A.,[1] by and through their attorneys, LatinoJustice PRLDEF ("LatinoJustice") and Dechert LLP ("Dechert") respectfully allege as follows:

---

[1] E.B., M.C., and V.A. intend to file a motion to proceed under pseudonyms pursuant to *Sealed Plaintiff v. Sealed Defendant #1*, 537 F.3d 185 (2d Cir. 2008).

## PRELIMINARY STATEMENT

1.      This civil rights action is brought on behalf of all Limited English Proficient ("LEP")

individuals who are, have been, or will be at risk of being subject to discriminatory treatment on

account of their national origin and LEP status by the Nassau County Police Department

("NCPD"). Along with organizations Central American Refugee Center-NY and Long Island

Language Advocates Coalition, named Individual Plaintiffs E.B., M.C., and V.A., on behalf of a

class of all similarly situated individuals, bring this action to remedy the NCPD's longstanding

and continuing practice of discriminatory and unconstitutional conduct toward LEP individuals.

2.      Ten years ago, Nassau County (the "County") passed two executive orders requiring

public-facing agencies to provide equal access to services for those with limited English

proficiency. Ten years later, NCPD continues to deny LEP community members adequate

translation and interpretation, equal access to NCPD services, and fair treatment under the law

based on their national origin and LEP status.

3.      This practice is in stark contrast to the County's stated policy regarding language

access—a stated policy that is not followed in practice and which officers can breach with

impunity.

4.      Plaintiffs are a non-profit organization serving Nassau County's large and growing

immigrant population, an unincorporated not-for-profit association that engages in education and

advocacy to improve meaningful access to public programs and services on Long Island for LEP

and sensory impaired individuals, and current and former residents of Nassau County who were

denied language assistance by NCPD. As demonstrated below, these are not isolated incidents, but part of a historical and continuing pattern of intentional discrimination and deliberate indifference towards the constitutional rights of Nassau County's LEP community members.

5.      Through this action, Plaintiffs seek declaratory and injunctive relief for Defendants' violations of federal and state law.

## JURISDICTION & VENUE

6.      This court has subject-matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3-4), as this action seeks redress for the violation of Plaintiffs' constitutional and civil rights.

7.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

8.      This Court also has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over Plaintiffs' related claims arising under the New York State Constitution.

9.      This court has personal jurisdiction over all Defendants as they are domiciled in New York, among other bases of personal jurisdiction.

10.     Venue is proper within this Judicial District pursuant to 28 U.S.C. § 1391(b) because all or a substantial part of the events or omissions giving rise to the claims herein occurred in the Eastern District of New York.

**PARTIES**

**Plaintiffs**

11.     Plaintiff Central American Refugee Center – CARECEN (NY) ("CARECEN") is a
not-for-profit 501(c)(3) organization headquartered in Hempstead, Nassau County, New York.
CARECEN is one of the largest immigration legal services providers on Long Island with the
mission of empowering immigrant communities through legal services, community education,
and advocacy. Almost all of CARECEN's clients are LEP. CARECEN was founded in 1983
with the mission of helping immigrants, particularly those of Central American origin fleeing the
brutality of civil war in their countries of origin. Since that time, CARECEN has grown to be the
largest Central American immigrant rights organization in the country.

12.     Plaintiff Long Island Language Advocates Coalition ("LILAC") is an unincorporated
not-for-profit association operating throughout Long Island, New York. LILAC engages in a
range of activities to improve service to underserved Long Island communities, especially those
who experience language barriers. It hosts monthly meetings where members share updates on
local resources and events, acquire new skills, and strategize regarding issues that impact
immigrants, LEP communities, and people with vision and hearing challenges. LILAC hosts
conferences and trainings regarding best practices in language access and serves as a resource to
organizations seeking to improve their language access policies and practices. LILAC has also
engaged in collaborative research and writing projects in partnership with other local community
organizations, including numerous rounds of language access testing of Nassau and Suffolk

County agencies and departments to measure their successes and deficiencies. Where issues have been identified, LILAC engages in advocacy with the heads of various departments to work together for improvements.

13.    Plaintiff E.B. is a LEP, of Latin American origin, adult resident of the County of Nassau, State of New York who was denied language access on at least two separate occasions by NCPD in September 2023.

14.    Plaintiff M.C. is a LEP, of Latin American origin, adult resident of the County of Queens, State of New York and who was denied language access services on at least two separate occasions by NCPD when she was a resident of Nassau County between 2014 and 2022. She and her child are frequently present in Nassau County, where the father of her child lives and who has partial custody of her child.

15.    Plaintiff V.A. is a LEP, of Latin American origin, adult resident of the County of Queens, State of New York and who was denied language access services by NCPD when she was a resident of Nassau County between 2020 and 2021.

16.    Individual Plaintiffs E.B., M.C. and V.A. bring this action on behalf of themselves and as representatives of the Class of all similarly situated Limited English Proficient individuals who are, have been, or will be at risk of being subject to discriminatory treatment and unconstitutional denials of assistance by NCPD.

**Defendants**

17.     Defendant Nassau County is a county within the state of New York. Pursuant to the Municipal Home Rule Law, Nassau County is authorized to issue a county charter that provides for the "agencies or officers responsible for the performance of the functions, powers and duties of the county." N.Y. MHR Ch. 36-1, Art. Part 1 § 33(3)(b). Nassau County is ultimately responsible for the Nassau County Police Department and therefore liable for injuries to Plaintiffs and members of the class caused by the policies and practices set forth below.

18.     Defendant Nassau County Police Department ("NCPD") was established by Article VII, Section 801 of the Nassau County Charter that was passed in accordance with the Municipal Home Rule Law. NCPD is headquartered at 1490 Franklin Avenue, Mineola, NY, 11501, in Nassau County. NCPD operates eight precincts. NCPD has established the policies and practices that led to Plaintiffs' and class members' injuries.

19.     Defendant Patrick Ryder is, and at all times relevant to the Complaint was, the Commissioner of the Nassau County Police Department and serves as NCPD's chief policy officer, responsible for the policies of NCPD. He is and was, at all relevant times herein, responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of the police officers under his command who are or were employed by NCPD, including the individual defendants named herein. Defendant Ryder's official actions are the direct and proximate causes of the injuries to Plaintiffs and evinced a deliberate indifference to Plaintiffs' legal rights. He is sued in his official capacity for actions that he undertook under color of state law.

20.     Defendant Officer John Doe is, and at all times relevant to the Complaint was, the head of the Internal Affairs Unit for NCPD and serves as the chief policy officer with regard to internal investigations and discipline of NCPD officers.  He is and was, at all relevant times herein, responsible for developing policies regarding the investigation, discipline, counseling, and control of police officers who are or were employed by NCPD. Defendant Officer John Doe's official actions are the direct and proximate causes of the injuries to Plaintiffs and evinced a deliberate indifference to Plaintiffs' legal rights. He is sued in his official capacity for actions that he undertook under color of state law.

21.     Defendant Sergeant Sabrina Gregg is the designated Language Access Coordinator for NCPD. As such, she is responsible for supervising NCPD's Language Access plan, instituting measures to monitor the success of the plan, and reviewing and updating the plan on a semi-annual basis. She is the chief policy officer for NCPD with regard to the implementation, monitoring, training, and modification of the Language Access Plan. Defendant Gregg's official actions are the direct and proximate causes of the injuries to Plaintiffs and evinced a deliberate indifference to Plaintiffs' legal rights. She is sued in her official capacity for actions that she undertook under color of state law.

22.     Nassau County and NCPD have been recipients of millions of dollars of federal funds during the relevant period.

## STATEMENT OF FACTS

### Background

23.     According to the most recent U.S. Census, Nassau County is home to over 418,000 residents (30%) over 5 years old that speak a language other than English at home. Approximately 22.4% of County residents—almost 310,000 people—are foreign born. In the past two decades, Nassau County's population growth has been fueled almost entirely by immigrants, a significant percentage of whom are Latino and who have immigrated from countries in Central and South America. Long Island is also home to large East Asian and South Asian populations, as well as a growing Haitian refugee population.

24.     Nassau County Police Department is one of the largest police departments in the country. However, the diversity of its personnel does not reflect the communities it serves. While over 40% of Nassau County identifies as non-White, only 13.2% of NCPD's police force identifies as either Black, Latino, Asian, or "other."

25.     For years, Defendants have engaged in, and are continuing to engage in, a pattern and practice of discriminatory and unconstitutional conduct toward the growing population of LEP and foreign-born individuals in Nassau County.

26.     Encounters with law enforcement agents frequently involve unfamiliar or intimidating situations. Even for individuals who speak, read, or understand some English, they may still have trouble understanding complex forms and instructions or explaining themselves proficiently, particularly during a time of crisis or enhanced stress.

27. Failure to provide interpretation and translation services in this context prevents individuals from receiving emergency assistance, obtaining an order of protection, reporting a crime, and effectively communicating with police in a range of circumstances. Denials of language assistance by law enforcement agencies also have a traumatizing effect, for instance, where children are used as interpreters.

28. In 2000, the U.S. Department of Justice affirmed that recipients of federal funds have an obligation to provide meaningful access to services to individuals with limited English proficiency and that an agency's willful failure to do so constitutes national origin discrimination. See DOJ Enforcement of Title VI of the Civil Rights Act of 1964—National Origin Discrimination Against Persons With Limited English Proficiency; Policy Guidance, 65 Fed. Reg. 50123 (Aug. 16, 2000). Presidential Executive Order 13166 (August 11, 2000) also directs all federally funded agencies to take steps to ensure that LEP individuals have access to their programs and services.

29. Ten years ago, then-Nassau County Executive Edward Mangano issued two executive orders (as discussed below) requiring county agencies to offer equal access to services for LEP individuals.

30. To date, despite the longstanding knowledge of their obligations under both local and federal law, Defendants have continued to engage in intentional discrimination against LEP individuals based on their perception that non-native English speakers are foreign born and not American.

**NCPD's Pattern and Practice of Discriminatory and Unconstitutional Conduct Towards LEP Individuals Directly Harmed and Continues to Harm Individual and Organizational Plaintiffs**

*Organizational Plaintiff CARECEN*

31.     For more than forty years, CARECEN has provided a range of services to immigrant community members, including legal representation in immigration proceedings and applications, English language education, and social work services for recently arrived immigrants. Almost all of CARECEN's clients are LEP and the majority come from countries in Central America.

32.     Because of NCPD's pattern and practice of discriminatory and unconstitutional conduct toward LEP individuals in Nassau County, CARECEN has repeatedly diverted time and resources away from its regular activities to assist clients who have been denied linguistically appropriate services by NCPD.

33.     CARECEN staff repeatedly must help clients to problem solve after language access denials and spend time locating and communicating with outside assistance to help clients file complaints against NCPD.

34.     For example, as recently as April 2023, CARECEN represented a client who was denied interpretation during a domestic dispute and when he tried to call a friend to help interpret for him, NCPD officers took his phone away. Such incidents are not isolated, but frequently arise and create significant challenges for CARECEN during the course of its representation of approximately one thousand immigrant community members each year.

*Organizational Plaintiff LILAC*

35.     Since 2010, LILAC has engaged in education and advocacy to improve and promote equal access to programs and services, including health care, education, social services, housing, law enforcement, and the court system for persons with limited English proficiency or with sensory impairments.

36.     LILAC engages in a range of activities. It hosts monthly meetings where members share updates on local resources, events, information, and developments that impact immigrants, LEP communities, sensory impaired communities, and particular advocacy communities such as health care and social services providers on Long Island. It hosts member-focused educational events where members can network, connect, and share knowledge and training on topics of interest, as well as community-facing events where community members can learn about available services in their areas. It has also engaged in collaborative research and writing projects in partnership with other local community organizations, including numerous rounds of language access testing of Nassau and Suffolk County agencies and departments.

37.     LILAC's language access testing and advocacy initially covered the full range of Long Island government agencies and departments, including social services, veteran's affairs, consumer affairs, health, labor and housing and development agencies.

38.     In recent years, the group has had to increase its focus on lack of language access to Nassau County police services due to reports and requests for assistance from community members about denials of assistance by the NCPD on account of their LEP status.

39.     Most recently, in 2022, LILAC conducted ninety-four language access phone test calls covering all eight NCPD precincts and headquarters, finding that NCPD failed to provide language assistance almost half of the time.

40.     Over the years, LILAC has received referrals and requests for assistance from community members who were denied assistance by public agencies. LILAC has assisted some of these individuals in filing administrative complaints.

*Individual Plaintiff E.B.*

41.     Plaintiff E.B. is a native Spanish language speaker of Latin American origin. She does not read, write, or understand English aside from basic terms.

42.     E.B. currently resides in Uniondale, NY and has resided in Nassau County for eight years.

43.     On or about September 1, 2023, the owner of the home she subleased cut off the electricity in the home.

44.     E.B. reached out to the sublessor who connected with the electricity company. He was informed by the electric company that they had an order to cut off the electricity in the home by September 1, 2023, and could not turn it back on until the renter could provide an updated signed lease.

45.     The sublessor visited the home with an English-speaking friend to assist E.B. Upon arriving, the English-speaking friend contacted NCPD and acted as an interpreter.

46.     An officer arrived at the home and the friend assisted as an interpreter between E.B. and the officer. The officer informed her that they could not do anything. Her only option was to go to court.

47.     E.B. reached out to an eviction prevention organization in Long Island for assistance and was informed this was considered an illegal eviction. She was advised to visit the police precinct for assistance in filing a criminal complaint.

48.     Under New York State Law, it is a criminal misdemeanor to illegally evict a resident, including by turning off their utilities.

49.     On or about September 1, 2023, E.B. visited the NCPD's First Precinct in Baldwin, N.Y. to report the illegal eviction.

50.     E.B. visited the precinct with her two minor children, the sublessor, and an English-speaking friend.

51.     Upon her arrival, E.B. asked the officer for an interpreter because she wanted to make a criminal complaint. The friend communicated with the officer and explained E.B. wanted an interpreter because she did not speak English and wanted to ensure she was able to fully explain her issue and understand what was communicated by the officer.

52.     The officer declined to provide an interpreter despite E.B.'s repeated request. The Officer stated that E.B. had a friend who could speak English and Spanish. When E.B. again requested an interpreter, the officer stated it was not necessary because it would be "too slow," "too costly" and "too difficult" and it would be easier if her friend just translated.

53.     Due to NCPD's refusal to provide an interpreter, E.B.'s friend was forced to serve as an interpreter between the officer and E.B.

54.     The officer communicated with the owner's wife who first stated she would stop by and then called back to inform that she would not come in and the electricity would not be turned back on until a new lease was signed with a higher rent and security deposit.

55.     E.B. asked if she could file a criminal complaint against the homeowners but was denied. Because of NCPD's refusal to hear or assist her, she was unable to file a criminal complaint with the police department or otherwise have her complaint heard.

56.     On or about September 3, 2023, the home was condemned as uninhabitable. A notice was left on the home informing E.B. she had to leave the home in 2 days.

57.     On or about September 5, 2023, a town inspector and the homeowner visited the home. The firefighters and police were called.

58.     Officers from NCPD arrived and informed E.B. she had to vacate the home. She repeatedly asked the officers for an interpreter and her requests were ignored. The officers only communicated, in English, that she had to leave. E.B. did not receive any further assistance or communication from NCPD regarding her illegal eviction.

*Individual Plaintiff M.C.*

59.     Plaintiff M.C. is a native Spanish language speaker of Latin American origin. She does not read, write, or understand English aside from basic terms.

60.     M.C. currently resides in Queens, New York and was a resident of Nassau County between 2014 and 2022.

61.     M.C. still frequents Nassau County for child visitations between her daughter and former partner.

62.     The first time M.C. contacted NCPD was in September 2020.

63.     During a domestic dispute with her partner, M.C. found explicit photos and communications between him and other women on his phone. When M.C. tried to take the cell phone, M.C.'s partner pushed her up against a chair.

64.     M.C. contacted the police. Upon their arrival, they entered the home and began to speak in English. Despite being unable to communicate in English, she was not offered any interpretation services.

65.     M.C. called her son by phone and ask him to speak to the officers in English for her. He was unable to do so as he was at work.

66.     The officers attempted to communicate with M.C. but once they realized she could not speak English, they turned to her partner to communicate with him about the incident.

67.     The officers communicated exclusively with M.C.'s partner and she was unable to communicate the physical altercation that took place.

68.     After communicating with her partner, the officers left the home. No one followed up to discuss the incident with her directly or assess her safety. NCPD did not provide M.C. with any paperwork regarding the incident.

69.     On July 4, 2022, M.C. contacted the police regarding a second domestic dispute.

70.     Again, M.C. and her partner engaged in a physical altercation over his cellphone and messages she had seen of him communicating with another woman.

71.     M.C. attempted to grab the phone when she was then shoved against a wooden chair in their bedroom and then up against the wall. M.C. walked away from the altercation with scratches on her arms, neck, back and both hands, bruises on her leg and a nosebleed. M.C. was also recovering from breast surgery and realized the incision areas were also bleeding.

72.     M.C.'s seven-year-old daughter entered the room demanding that her dad stop hitting M.C. M.C.'s daughter proceeded to grab her tablet and began recording the altercation. Once M.C.'s partner saw their daughter recording, he stopped trying to engage with her.

73.     M.C. called 911 and began to speak in Spanish and then in limited English exclaimed "Help me, Help me." She added, "No English, Speak Spanish" but the operator continued to communicate in English. She passed the phone to her young daughter who had to explain the incident and provided their home address.

74.     Thereafter, NCPD officers arrived at the home and again M.C. tried to communicate that she did not speak English. The officers eventually called for a Spanish speaking officer.

75.     While waiting for the Spanish speaking officer to arrive, the officers began to communicate with M.C.'s seven-year-old daughter in English about the incident. M.C. could not understand the questions her child was asked or what responses were provided.

76.     Once the Spanish speaking officer arrived, M.C. began to explain what occurred. M.C. asked the officer to provide her with a document or report to use against her husband and prevent him from physically attacking her. The Spanish speaking officer concluded with "We'll see what we do."

77.     While the Spanish speaking officer spoke with M.C.'s partner, she sat downstairs ~~and was eventually~~. Eventually, she was signaled by one of the English-speaking officers to come over to the table and was told that she needed to sign a document. The officer did not communicate the contents of the document prior to or after signing. The Spanish speaking officer had left and did not assist in translating the document.

78.     Eventually, M.C. sought outside assistance to obtain a translation of the police report and realized the report failed to detail her injuries, including the visible marks left on her face and body.

79.     M.C. decided to file a complaint against the police department ~~for failure to~~to request that they correct the inaccuracies in the report, improve their treatment of survivors of domestic abuse, and provide adequate language assistance during ~~the~~ domestic violence ~~incident. Using~~incidents. M.C. filed her complaint using NCPD's online complaint portal ~~for filing complaints and~~with assistance from a local non-profit~~, M.C. filed a complaint against NCPD~~.

While she received a complaint number, no one from NCPD ever followed up with her and she is not aware of any investigation regarding her complaint.

80.     Because she never received a response, she was unable to make an accurate police report.

*Individual Plaintiff V.A.*

81.     80. Plaintiff V.A. is a native Spanish language speaker of Latin American origin.

82.     81. On July 19, 2020, she contacted NCPD after her landlord changed the locks to the apartment.

83.     82. At the time the locks were changed V.A. was inside the home with her children. There was no pending eviction case.

84.     83. V.A. called 911 and in Spanish requested an interpreter. After a brief hold, an interpreter joined the call. She explained the incident and was informed officers would come to the home.

85.     84. A few moments later, two officers from NCPD's Third Precinct, Post 321 arrived at the home. Since V.A. had just informed the 911 operator of her need for interpretation services, she assumed the officers would be aware she did not speak English.

86.     85. One of the officers approached V.A. and began to communicate in English. V.A. responded by requesting a "translator" to which the officer responded "**No, this is the United States of America, we speak English in the United States.**"

87.     86. V.A. exclaimed in Spanish that she was aware of her rights and again continued to ask for an interpreter to no avail.

88.  87. V.A. recorded this interaction on a camera she had previously installed because the landlord had been entering the home without her knowledge.

89.  88. After approximately 20 minutes of asking for an interpreter, V.A. called 911 again and informed them that the officers had not provided her with an interpreter. It was not until her second call to 911 that an interpreter was provided.

90.  89. The officers never took down a report or handed her any paperwork.

91.  90. After the incident, V.A. decided to file a complaint against the officer.

92.  91. On multiple different occasions, V.A. went to the precinct where she believed the officer was assigned and was told it was not the correct place to make a complaint. She was never provided guidance about where or how to file a complaint against the officer.

93.  92. With help from LILAC, on or about September 28, 2020, V.A. was able to file a complaint via the NCPD website, translated through Google Translate. V.A. subsequently received one phone call from NCPD where she was asked to restate what occurred during the interaction with NCPD. At the conclusion of the call, she was informed that she would receive a follow-up call. However, she never received any further follow-up from the department. She was never able to provide additional evidence or receive confirmation as to what if any disciplinary steps were taken by NCPD.

**Defendants' History of Discriminatory Treatment of LEP Individuals in Nassau County**

*NCPD Has Failed to Provide Language Access for Years*

94. 93. In 2013, then-Nassau County Executive Mangano issued two executive orders on language access, which remain in effect until this day. The first of Nassau County's two executive orders on language access was significantly more limited in scope than the County had originally represented to community-based organizations and, as a result, was met with immense disappointment and opposition by advocates and LEP community members. The lackluster order – Executive Order 67 ("EO 67"), issued in July 2013 – was limited to the requirement that county agencies make available on the County website translations of "vital documents" in the County's six most common non-English languages, assign a Language Access Coordinator, and develop a language access plan. But it was silent on other critical requirements needed to comply with federal law, including competent telephonic and in-person interpretation, training requirements, translation of signage, and data collection and reporting requirements. A true and accurate copy of the Executive Order 67-2013 is attached hereto as Exhibit 1.

95. 94. After sustained pressure from advocates, including phone calls, emergency meetings, and word of an imminent public campaign, on August 15, 2013, then-County Executive Mangano signed a second executive order—Executive Order 72 ("EO 72")—to address the deficiencies in the original EO 67. EO 72 provides that each public-facing Nassau County agency publish a language access plan, provide competent in-person and telephonic interpretation services, provide the Deputy County Executive with a list of all competent

bilingual employees, provide employee training on the department's language access plan, and issue a public notice of language access services. EO 72 also prohibits county employees from using a request for language services as a basis for inquiring into confidential information relating to immigration status. A true and accurate copy of EO 72-2013 is attached hereto as Exhibit 2.

96.    ~~95.~~ Since 2013, despite countless attempts by community-based advocates to work with Defendants to implement the promises of the executive orders, there has been little meaningful progress made. The County's promises have rung hollow.

97.    ~~96.~~ For instance, after the signing of EO 67 and EO 72, community-based advocates and organizations made numerous attempts to contact the Nassau County Executive Office to inquire about the status of implementation. Each time, they received an insufficient response or no response. Advocates also launched numerous campaigns and rallies highlighting Defendants' noncompliance with federal law and the executive orders.

98.    ~~97.~~ As reported by *Newsday* in July 2014, one member of the Long Island Civic Engagement Table remarked "this shows without a doubt that Nassau County has failed to meet its own language access policy." *See* Paul Larocco, "Nassau Faulted on Language Services," *Newsday*, Aug. 18, 2014.

99.    ~~98.~~ For years, NCPD has issued paper polices that profess to offer language access that in practice is not provided. The most recent such plan is the 2023 NCPD Language Access Plan ("the Plan").

100.  ~~99.~~ A true and accurate copy of the Plan is attached as Exhibit 4 (NCPD OPS 3132) and Exhibit 5 (NCPD Language Access Plan 2023 PowerPoint).

101.  ~~100.~~ Defendant Domestic Liaison Officer Detective Sergeant Sabrina Gregg is designated as NCPD's Language Access Coordinator (LAC). As LAC Defendant Gregg is charged with supervising and monitoring the Plan.

102.  ~~101.~~ The Plan does not adequately ensure that language access is provided to those who request or need language assistance in Nassau County. Even if it were implemented as it is written, in practice, NCPD makes no effort to enforce the Plan.

103.  ~~102.~~ The Plan allows NCPD "bilingual" personnel to self-assess their language proficiency. NCPD does not have an objective practice or procedure in place to test whether its officers are truly competent in a foreign language.

104.  ~~103.~~ The Plan does not ban NCPD personnel from using family members, friends, or passersby as interpreters unless the person (a) has a personal interest in the situation, (b) for admissions, confessions, or sworn statements, or (c) is the perpetrator of a domestic incident and would be translating for the alleged victim or complainant. The Plan only bans the use of minor children as interpreters in a "high stress situation."

105.  ~~104.~~ The Plan does not ban NCPD personnel from inquiring into a person's confidential information relating to immigration status if the person is charged with a crime.

106.  ~~105.~~ The Plan instructs NCPD personnel to say "un momento" to an LEP caller, regardless of whether the caller is a Spanish speaker.

107. ~~106.~~ NCPD currently uses a phone-based service called "Language Line" that gives officers access to an interpreter in over 250 languages. Based on information and belief, NCPD started implementing the use of Language Line in or around October 2018.

108. ~~107.~~ Based on information and belief, the only language access data collected by the NCPD is the number of times Language Line is affirmatively used by NCPD personnel. NCPD does not appear to collect or report data on the number of times officers fail to use Language Line.

109. ~~108.~~ Based on information and belief, NCPD does not collect or report data on the number of times community members request language assistance.

110. ~~109.~~ NCPD does not appear to collect or report data on the number of times community members file a complaint relating to the denial of language access services. In response to FOIL requests, NCPD has not produced any documents or statistics relating to complaints for failure to provide language access.

111. ~~110.~~ As set forth below, NCPD officers do not, in practice, follow the Plan. And Defendants do not expect them to or seek to hold them accountable when they do not.

112. ~~111.~~ NCPD officers do not follow the Plan because Defendants do not require them to. The policies and practices of NCPD, the County, and the Individual Defendants have resulted in a widespread informal policy that compliance with the Plan is entirely voluntary.

113. ~~112.~~ NCPD moreover does not investigate complaints of failure to provide language access and does not discipline officers even when presented with evidence that officers violated the Plan and did not provide language access.

114. ~~113.~~ Plaintiffs have filed complaints with NCPD's Internal Affairs Unit and have set forth specific incidents of failure to provide language access—including an incident in which the complainant was willing to provide video evidence of an officer refusing to provide language access—and have received no investigative follow-up or response. The NCPD never saw the video because they denied the complainant an opportunity to file a complaint in person and correspondingly never investigated after she filed a complaint online.

115. ~~114.~~ Instead, as described below, Defendant Ryder has stated he is not aware of any complaints and pre-emptively cleared his officers of wrongdoing by stating "I don't believe my officers acted that way."

116. ~~115.~~ In fact, Defendants simply ignored the many complaints they received.

117. ~~116.~~ By publicly stating that no complaints existed, and no officer had failed to provide language access—statements that Defendant Ryder knew were untrue when he made them—NCPD sent a clear message to its officers. Compliance with the Plan is entirely optional and any officer who chooses not to provide language access is free to do so without repercussions.

118. ~~117.~~ Each Plaintiff has been denied language access by NCPD officers and has sought to have the officer who denied language access investigated or otherwise held accountable. Their complaints have gone unanswered, uninvestigated, and unheard.

119. ~~118.~~ NCPD personnel not only fail to provide language services, but on some occasions actively mock and humiliate LEP individuals who request such services as well as the advocates who have brought language access problems to their attention.

120. ~~119.~~ Instead of using appropriate Language Line services, NCPD officers have used minor children as interpreters during domestic violence disputes.

121. ~~120.~~ The immigrant communities served by CARECEN are particularly vulnerable to NCPD's unlawful practices, which leave them unable to communicate with police in emergency situations, to get the protection they need, to file police reports, and to obtain medical assistance.

122. ~~121.~~ Individual Plaintiffs E.B., M.C., and V.A., and the community members that Organizational Plaintiffs CARECEN and LILAC serve, have suffered various injuries from NCPD's failure to provide language access:

- they were asked to sign summaries of interviews they do not understand;

- they were not provided with the proper resources and assistance during domestic violence incidents and illegal evictions;

- their children were forced to interpret leading to traumatization and inaccurate reports;

- they were denied assistance when calling for help; and

- they were told that this is all their fault: "This is the United States. We speak English."

123. ~~122.~~ These actions by NCPD officers constitute the NCPD's real language access policy—one in which any officer can deny any person language access with complete impunity.

*Years of Language Access Testing Show NCPD Willfully Denies Assistance to LEP Individuals*

124. ~~123.~~ One Year after the issuance of EO 67 and 72, volunteer advocates led by LILAC began language access testing of county agencies, including the NCPD. The reports of these initial audits were made public in August 2015, in a report co-authored by LILAC, Health and Welfare Council of Long Island, and Long Island WINS. The report, titled *Language Access Denied: Ed Mangano's Broken Promise to Nassau County,* details the history of local advocates' efforts to improve language access on Long Island, as well as the results of volunteer audits conducted in August 2014, April 2015, and July 2015. A copy of the report is attached hereto as Exhibit 3.

125. ~~124.~~ **August 2014 Testing:** As detailed in *Language Access Denied*, in August 2014, volunteers conducted language access testing through phone calls, checking websites, and in-person visits to five Nassau County agencies: Department of Social Services, Department of Health, Department of Human Services, Probation Department, and the NCPD. NCPD, along with all other audited agencies, was found to be deficient in providing language assistance. Advocates issued the county a failing grade in complying with its own executive orders. *See* Ex. 3, Appendix 2.

126. ~~125.~~ **April 2015 Testing:** In April 2015, volunteers conducted another round of testing of several Nassau County agencies, including Office for the Aging, Consumer Affairs, Minority

Affairs, Housing and Community Development, Veterans Services, Social Services, Fire

Commission, NCPD headquarters, and all NCPD precincts. Volunteers for the April 2015 testing

spoke Mandarin Chinese, Spanish, Korean, Haitian Creole and Russian. The volunteers called

the agencies and requested language assistance by stating the language they were seeking, for

example, "Spanish?" No false reports or requests for emergency assistance were made. Again,

NCPD was found to be deficient in its provision of language assistance.

127. ~~126.~~ During the audit, volunteer test callers were disparaged on account of their

perceived national origin and LEP status. For example, one Spanish speaking caller to NCPD,

who was unable to receive any assistance, was told, in English "**If problema, you have to call**

**911.**" Another female Spanish-speaking volunteer caller to the First Precinct was degradingly

referred to as "**Mami**" by a male NCPD officer. The officer then proceeded to intimidate her,

asking **where she lived, how many years she had lived in this country, and why she did not**

**speak English**. Not a single caller was immediately transferred to a professional interpreter.

128. ~~127.~~ In addition to the calls, in April 2015, volunteer auditors also made in-person visits

to five of NCPD's eight police precincts and police headquarters. Auditors reported that not a

single location had signs posted informing the public of the availability of an interpreter, and the

only sign posted in Spanish pertained to drug abuse.

129. ~~128.~~ Apprised of these ongoing issues, on June 10, 2015, six Nassau County legislators

wrote a letter to the County Executive stating they were "deeply troubled that the County is not

enforcing implementation of Executive Orders 67 and 72 and that its agencies are not providing

adequate interpretation and translation services or translation of vital documents into the six most frequent languages, as promised." The legislators also expressed their embarrassment that the County Executive "has repeatedly refused to meet with [community-based organizations] to discuss problems with implementation of the Orders and the resulting disservice to our constituents." Exhibit 3, at Appendix 1.

130.    129. **July 2015 Testing:** In July 2015, volunteers conducted another audit in Spanish, finding continued deficiencies in every police precinct. Spanish-speaking callers were unable to obtain any assistance from NCPD precincts 1, 2, 3, 4, and 7 and police headquarters.

131.    130. In August 2015, after learning of the results of the volunteer audits, the NCPD arranged for a meeting with language access advocates. During the meeting, they acknowledged that there were deficiencies which needed to be addressed and promised to implement changes. While some changes were made to NCPD's paper policy and the rollout of a telephonic interpretation system "Language Line", there have not been meaningful agency-wide improvements in practice and NCPD's language access denials and hostility towards LEP community members has continued unchecked.

132.    131. LILAC has continued to participate in volunteer language access testing of NCPD almost annually.

133.    132. **2017 Testing:** In 2017, LILAC found that NCPD only provided successful assistance in 1 out of 20 calls. LILAC shared the results with then-County Executive Laura Curran who acknowledged at a public meeting that the County was "not where [it] should be on

language access." *See The People's Plan: Reimagining Policing and Public Safety on Long Island* at 239 (February 19, 2021),

https://www.liunited.org/_files/ugd/2eb0a3_ef9104dd53c34bedb390743badd17fb9.pdf

(hereinafter "The People's Plan").

134.    ~~133.~~**March 2019 Testing:** In 2019, LILAC found that NCPD only provided language assistance (via transfer to Language Line) in 3 out of 19 calls. In numerous calls testers were dismissed with statements such as "**No speak Spanish, no interpreter**," "wrong number," or "You have to call 911, we don't have an interpreter."

135.    ~~134.~~Following the 2019 testing, LILAC met with NCPD Commissioner Ryder, Sergeant Gregg, and other NCPD staff who were made aware of the results of the test calls. During the meeting, Commissioner Ryder became hostile and threw LILAC members out of the meeting. *See* The People's Plan at 239. LILAC followed up with a letter outlining the group's concerns. Although NCPD was made aware of the findings, it refused to take any meaningful action.

136.    ~~135.~~**August 2020 Testing:** In 2020, test callers conducted another round of calls in Spanish and were only able to obtain assistance in 12 out of 21 calls. Several test callers reported rude or inappropriate comments. For example, when a test caller asked in Spanish whether a landlord could evict a tenant without taking the tenant to court, an officer of the NCPD Eighth Precinct **told the caller to get a job and pay the rent**.

137.    ~~136.~~**February-April 2022 Testing:** Between February and April 2022, the New York Immigration Coalition ("NYIC") and LILAC conducted additional testing to determine NCPD's

compliance with the Language Access Plan. A report they issued, "Unprotected and Unheard," which outlines their findings is attached as Exhibit 6.

138.    ~~137.~~ In 2022, volunteers conducted an audit of all eight NCPD precincts and police headquarters, seeking assistance in Spanish for non-emergency questions designed to assess whether NCPD would accommodate non-English speaking callers in a timely and professional manner and comply with the Plan by connecting the caller to a fluent bilingual officer or a professional interpreter, such as through Language Line. In total, seven volunteers made ninety-four calls requesting information in Spanish. The testers were unable to obtain language assistance or get the requested information 44 times (46.8% failure rate). In the eight calls made to NCPD headquarters none of the testers were provided with help in the language requested.

139.    ~~138.~~ Testers also recorded contemporaneous notes about their experience on a spreadsheet. Numerous testers noted being hung up on after rude, impatient, or hostile treatment from NCPD officers. Several officers did not know how to use Language Line or did not try to use it at all. In some cases, callers felt intimidated by officers who insisted that the caller give them personal information or appear in person at the precinct in order to receive service. Some officers who spoke Spanish poorly attempted unsuccessfully to speak to callers in Spanish instead of connecting them to a professional interpreter through Language Line. In cases where testers did receive help from bilingual officers, they reported having more positive interactions.

140.    ~~139.~~ NCPD was made aware of the findings of the report and failed to take meaningful action.

141. ~~140.~~ On September 27, 2022, representatives from LILAC and LatinoJustice attended a Hispanic Heritage Month event at the NCPD Training and Intelligence Center in Uniondale. In responding to the 2022 auditing and report by LILAC and NYIC, NCPD personnel including Sergeant Gregg responded defensively to advocates, suggesting they were "disingenuous," questioned the "veracity" of advocates' reports of language access failures, and concluded "obviously we're on two different pages here." NCPD personnel repeatedly made reference to the number of times Language Line was affirmatively used but could not or would not confirm if NCPD would take steps to assess its failure rate.

142. ~~141.~~ As advocates pointed out, no Spanish interpretation was offered or made available at the Hispanic Heritage Month event.

143. ~~142.~~ On October 6, 2022, Defendant Ryder spoke before the Nassau County Legislature and responded to LILAC and NYIC's 2022 testing report. Again, Defendant Ryder recited the affirmative times that Language Line has been used, but he denied being aware of any language access complaints. In response to specific incidents referred to in LILAC and NYIC's report, Defendant Ryder concluded "I don't believe my officers acted that way."

144. ~~143.~~ In its Police Reform EO203 2022 Year End Follow-Up Report, NCPD alleged that it began its own language access audits, consisting of four "controlled calls" to an unspecified precinct, one in Hindi, one in Punjabi, and two in Spanish.

145. ~~144.~~ Although NCPD contracts with a telephonic interpretation service to facilitate communication between it and the public, in practice, officers systemically fail to use this resource as the LILAC/NYIC report demonstrates and as Plaintiffs' experiences demonstrate.

### NCPD's Internal Affairs Unit Fails to Investigate Claims of Denial of Language Access as Part of a Broader Failure to Hold NCPD Officers Accountable.

146. ~~145.~~ The NCPD's Internal Affairs Unit has failed to investigate allegations of denials of language access and the NCPD officers who have denied language access to Plaintiffs and others have not been disciplined.

147. ~~146.~~ As reported last year by *Gothamist*, over the last six years NCPD's Internal Affairs Unit has never substantiated a civilian complaint against any officer. *See* Charles Lane, "A Screaming Red Flag: Out of 144 Civilian Complaints, Nassau Police Claim Zero Have Any Merit," *Gothamist*, Oct. 12, 2022.

148. ~~147.~~ This wasn't because officers of the NCPD do not engage in misconduct. To the contrary, in at least one case where NCPD's Internal Affairs Unit found no misconduct, a federal judge ruled that the evidence showed the officers "created false police records and made demonstrably false statements during the trial, used excessive and improper methods while taking these actions against the plaintiff." *Jenkins v. Cnty. of Nassau*, 540 F.Supp.3d 310, 313 (E.D.N.Y. May 18, 2021). The same evidence—if it was obtained by the NCPD—did not result in a finding of any misconduct at all.

149. ~~148.~~ NCPD's Internal Affairs Unit is best known for initiating an investigation against a New York Police Department officer at the behest of a television personality who believed the

32

officer was sleeping with his wife. *See* John Cook, "How Bill O'Reilly Tried to Get His Wife's Boyfriend Investigated By the Cops," *Gawker*, Aug 30, 2011.

150. ~~149.~~ Just this year, the State Attorney General's Office announced that it was investigating two NCPD officers who had conducted an illegal strip search and lied about it in federal court. *See* Charles Lane, "2 Nassau County Detectives Are Being Investigated for Misconduct," https://www.wshu.org/long-island-news/2023-04-19/2-nassau-county-detectives-are-being-investigated-for-misconduct, Apr. 19, 2023.

151. ~~150.~~ A recent investigation found that NCPD Internal Affairs provides little accountability, even in cases where officers caused serious injury or death. *See* https://projects.newsday.com/long-island/inside-internal-affairs/.

152. ~~151.~~ Nassau County continues to fight in court to withhold from the public disciplinary records and civilian complaint information against its officers, a more restrictive interpretation of the repeal of New York's police secrecy law than nearby departments have imposed. *See New York Civil Liberties Union v. Nassau County*, No. 612605/2021, (Nas. Cty. Sup. Ct. 2021).

153. ~~152.~~ Plaintiffs have complained or tried to complain to the NCPD after they were denied language access, hoping that the officers would face the consequences of violating department policy or that their grievance would result in some positive changes.

154. ~~153.~~ Advocates have presented Defendants with specific incidents in which LEP individuals were denied language access by NCPD. The NCPD has stated publicly the

33

Department has investigated these complaints and found the officers did nothing wrong. No investigators reached out to the individual complainants to take statements as part of these so-called investigations.

155.   ~~154.~~ NCPD has denied the opportunity to file complaints or failed to investigate or make findings on Plaintiffs' complaints about language access. It has done so because NCPD's actual practice is not to follow the Language Access Plan, but instead to allow officers to deny language access to LEP individuals with impunity.

156.   ~~155.~~ Because officers know they will not be disciplined by NCPD's Internal Affairs Unit for failing to provide language access, the provision of such assistance seems to be optional, thereby shutting out LEP individuals from access to appropriate police assistance and denying them their constitutional rights associated with police encounters.

157.   ~~156.~~ For any relief to impact NCPD's actual policies and practices, that relief must be directed in part at the Internal Affairs Unit to ensure that NCPD cannot evade its obligations by issuing a paper policy that is inadequate and is not enforced.

**Defendants' True Policy is to Allow Officers to Deny Language Access at Their Discretion**

158.   ~~157.~~ Defendants are aware that a significant portion of the population of Nassau County ~~uses~~comes from Central and South American countries and use Spanish as their primary language, and that many people in the county are more comfortable communicating in languages other than English.

159.   ~~158.~~ The Plan is merely a "paper policy" that is not followed in practice.

160. ~~159.~~ For example, the Plan states that Defendant Gregg will "institute measures to monitor the success of the plan," and that the plan will be "reviewed and updated as necessary on a semi-annual basis." Advocates have pointed out failures in the Plan but no changes have been made to address these failures.

161. ~~160.~~ The Plan states that NCPD will ensure that "all current NCPD members receive a copy of the Language Access Plan," and that "Force Member will review the NCPD Language Access Power Point," but does not indicate that officers will be trained, how often they will be trained, or that providing language access is mandatory.

162. ~~161.~~ Defendants fail to train officers on their obligation to provide appropriate language access to those who need it.

163. ~~162.~~ Defendants fail to investigate and discipline officers who do not provide language access to LEP individuals.

164. ~~163.~~ Defendants fail to screen officers for language proficiency and instead allow officers to self-certify as proficient in a foreign language when they are not.

165. ~~164.~~ Defendants are aware that a significant number of officers do not provide language services to LEP individuals.

166. ~~165.~~ Defendants' failure to train officers in their obligations to provide language access demonstrates their deliberate indifference towards their constitutional obligations to provide language access to LEP persons.

167. ~~166.~~ Defendants' failure to discipline officers who have not complied with their obligations to provide language access demonstrates their deliberate indifference towards their constitutional obligations to provide language access to LEP persons.

168. ~~167.~~ The failure to train officers in their obligations to provide language access are the moving forces behind Defendants' collective deprivations of Plaintiffs' civil rights under color of law.

169. ~~168.~~ Defendants' failure to train and failure to discipline noncompliant department personnel are the proximate causes for Plaintiffs' injuries.

## CLASS ACTION ALLEGATIONS

170. ~~169.~~ Plaintiffs bring this action for declaratory and injunctive relief pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on their behalf and, in the case of Individual Plaintiffs E.B., M.C. and V.A., as representatives of the following class of individuals: All past, present, and future Limited English Proficient individuals who are, have been, or will be at risk of being subject to discriminatory treatment or denials of assistance by NCPD because of their national origin and/or LEP status, including but not limited to policies, patterns, and practices in violation of law (the "Class").

171. ~~170.~~ Plaintiffs and the Class have suffered personal injury as a direct and proximate result of Defendants' actions herein for which an award of declaratory and injunctive relief is appropriate. The named Plaintiffs herein are members of the Class they seek to represent.

172. ~~171.~~ **Numerosity:** The Class includes hundreds, if not thousands, of individuals. Members of the Class are so numerous that joinder is impracticable because, based on information and belief, many of the members of the Class are not aware of the fact that their constitutional rights have been violated and that they have the right to seek redress in court. Many members of the Class are without the means to retain an attorney to represent them in a civil rights lawsuit. Moreover, many Class members who have been victimized by Nassau County and NCPD's unconstitutional practices do not bring individual claims for fear of retaliation and reprisal by NCPD officers. There is no appropriate avenue for the protection of class members' constitutional rights other than a class action.

173. ~~172.~~ **Commonality**: There are questions of law and fact common to the Class including, but not limited to:

    a.    Whether Defendants engage in a policy, practice, and/or custom of intentional discrimination against Limited English Proficient individuals based on their national origin and limited English proficient status;

    b.    Whether Defendants' failure to properly train, supervise, and investigate the intentionally discriminatory behavior of NCPD police officers, particularly whether it properly investigates and pursues allegations of failure to provide language access, constitutes deliberate indifference to the violations of the Plaintiffs' and Class members' rights;

    c.    Whether Nassau County, Commissioner Ryder, Officer John Doe, and Sergeant

Gregg have sanctioned and/or failed to rectify unlawful intentional discrimination against LEP individuals by members of NCPD;

d.      Whether the Class as a whole is entitled to permanent injunctive relief against Defendants, including, but not limited to, a mandatory injunction;

e.      Whether the class as a whole is entitled to a declaratory judgement that the acts of Defendants alleged herein and to be provided by the evidence constitute actionable violations of the civil and constitutional rights of each member of the Class; and,

f.      Whether the Class as a whole is entitled to an award of its attorneys' fees and litigation costs to be paid by Defendants under 42 U.S.C. § 1988(b).

g.      These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

174.    173. **Typicality:** The claims of the named Individual Plaintiffs are typical of the claims of the Class they seek to represent in that the named Individual Plaintiffs and all members of the proposed Class are LEP individuals who were denied translation or interpretation by NCPD, which deprived them of equal access to NCPD's services and/or protection. As a result of NCPD's pattern and practice of denying assistance to LEP individuals, named Individual Plaintiffs faced a range of harms that are typical of those faced by the Class, including being barred from reporting a crime, seeking legal protection from an abusive partner or landlord,

receiving notice of and an opportunity to correct the contents of police reports and criminal complaints, and communicating effectively with the police in a wide range of circumstances.

175. 174. As long as NCPD engages in the policy, practice, and/or custom of discrimination against LEP individuals based on their national origin and LEP status, the named Individual Plaintiffs, (as well as the communities served by Organizational Plaintiffs CARECEN and LILAC), are, and will remain, at high risk of deprivation of access to NCPD's assistance and services. Indeed, the named Plaintiffs have already been directly injured and burdened by NCPD's failure to provide translation or interpretation in a range of sensitive scenarios. The proposed Class seeks declaratory and injunctive relief as a result of injuries its members have sustained due to Defendants' conduct. The pursuit of this relief by the Class representatives for their injuries and losses will work to benefit the entire proposed Class they seek to represent.

176. 175. **Adequacy of Representation:** Individual Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class they represent. The named Individual Plaintiffs have retained counsel competent and experienced in class action litigation and civil rights law. Accordingly, the interests of the Class will be adequately protected and advanced. In addition, there is no conflict of interest between the named Plaintiffs and members of the Class. The interests of the named Individual Plaintiffs are aligned because members of the class have an interest in securing their right to prospective relief preventing future harmful conduct by Defendants.

177. 176. Notice can be provided to Class members by published notice.

178. ~~177.~~ Certification of the Class is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants have acted in a similar, virtually identical, way against each member of the Class, so that final injunctive relief, specifically appropriate mandatory injunctions, with corresponding declaratory relief is appropriate respecting the Class as a whole.

179. ~~178.~~ Certification of the Class is also appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because the questions of law and fact common to the members of the Class predominate over any questions affecting only individual members. This class action is superior to other available remedies for the fair and efficient adjudication of this controversy.

**CLAIMS FOR RELIEF**

**<u>FIRST CAUSE OF ACTION</u>**
**Intentional Discrimination Under**
**Title VI of the Civil Rights Act of 1964**
**42 U.S.C. § 2000(d),** ***et seq.***

180. ~~179.~~ Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

181. ~~180.~~ NCPD is a county agency in receipt of funding from the federal government.

182. ~~*181.*~~ Discrimination based on race or national origin is prohibited by recipients of federal financial assistance under 42 U.S.C. § 2000(d), *et seq.*

183. ~~182.~~ Defendants, though their policy, custom or practice, intentionally discriminated against Plaintiffs and class members based on their national origins and limited English proficient status in violation of Title VI of the Civil Rights Act and its implementing regulations.

184. 183. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered injuries and have been deprived of their rights under the civil rights laws.

**SECOND CAUSE OF ACTION**
**42 U.S.C. § 1983 – Equal Protection Discrimination*Monell* Claim**
**Fourteenth Amendment Violations**

185. 184. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

186. 185. Defendants denied Plaintiffs equal access to the services and protections of the NCPD based on their national origins. Such discrimination violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

187. 186. All Defendants were acting under color of state law when they deprived Plaintiffs of their rights to Equal Protection under the Fourteenth Amendment.

188. 187. Defendants Ryder, Officer Doe, and Sergeant Gregg were acting under color of state law when they developed and implemented policies and practices that were the direct and proximate causes of the deprivation of Plaintiffs' Equal Protection rights.

189. 188. 42 U.S.C § 1983 supplies a right of action to recover for these constitutional depravations.

190. 189. As a direct and proximate result of the above-mentioned acts, Plaintiffs have suffered injuries and damages.

**THIRD CAUSE OF ACTION**
**42. U.S.C. § 1983 – First Amendment Violation**

190. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

191. Defendants, through their policy, custom or practice of denying language services to limited English proficient individuals, prevented Plaintiffs from petitioning the government for redress of grievances and otherwise communicating with police officers from whom they sought assistance.

192. Defendants acted under color of state law to deprive Plaintiffs of their First Amendment right to petition the government for redress of grievances.

193. Defendants Ryder, OFFICER DOE, and Sergeant Gregg were acting under color of state law when they developed and implemented policies and practices that were the direct and proximate causes of the depravation of Plaintiffs' rights to petition their government for redress of grievances.

194. 42 U.S.C § 1983 supplies a right of action to recover for these constitutional depravations.

195. As a direct and proximate result of Defendant's actions, Plaintiffs suffered injuries.

### FOURTH CAUSE OF ACTION

### 42 U.S.C. § 1983 – *Monell* Claim

### First Amendment and Fourteenth Amendment Violations

196. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

191. 197. The Fourteenth Amendment violations set forth in Plaintiffs' Second Cause of Action and the First Amendment violations set forth in Plaintiff's Third Cause of Action above are both the result of the policies and customs of NCPD to fail to provide language access to

LEP community members, and therefore provide for liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 700-01 (1978).

192. 198. These failures constitute the policy and customs of NCPD under five separate Monell theories—they are the result of decisions by individuals with policymaking authority, they are the result of an informal custom, they are the result of NCPD's failure to train its officers, they are the result of NCPD's failure to supervise its officers, and they are the result of NCPD's failure to screen officers for language proficiency before reporting them as fluent in that language.

***Decisions by Policymaking Individuals***

193. 199. Defendant Ryder has final policymaking authority for NCPD and constitutes a county policymaker for whom the county is liable for such conduct.

194. 200. Defendant Officer John Doe has final policymaking authority for the Internal Affairs Unit of NCPD and constitutes a county policymaker for whom the county is liable for such conduct.

195. 201. Defendant Gregg has final policymaking authority for the implementation of the Language Access Plan for NCPD and constitutes a county policymaker for whom the county is liable for such conduct.

196. 202. Defendants Ryder, Officer John Doe, and Gregg developed and maintained policies, procedures, customs and/or practices exhibiting indifference to the constitutional rights of those in Nassau County with limited English Proficiency.

197. 203. While NCPD issued a "paper policy" setting forth a Language Access Plan, Defendants Ryder, Officer John Doe, and Gregg made policy decisions that constituted the real NCPD language access policy.

198. 204. These decisions included decisions by Defendants Ryder and Officer John Doe to refrain from investigating complaints of failure to abide by the Language Access Plan.

199. 205. These decisions also included a decision by Defendant Ryder not to evaluate compliance with the Plan by recording the number of times that language access was requested, but only recording the number of times it was provided.

200. 206. These decisions also included decisions by Defendant Gregg not to require officers to provide language access, and not to evaluate how often officers were denying language access to those who requested or needed it.

201. 207. As a direct and proximate result of the policy decisions by Defendants Ryder, Officer John Doe, and Gregg, NCPD officers regularly fail to provide language access to LEPs in Nassau County.

202. 208. As a direct and proximate result of the policy decisions by Ryder, Defendants Officer John Doe, and Gregg, Plaintiffs were denied language access by NCPD, resulting in violations of the First and Fourteenth Amendments.

*Informal Custom*

203. ~~209.~~ NCPD has developed a persistent, widespread custom and unofficial policy whereby officers are free to provide or decline to provide language access to those who request it at their individual discretion.

204. ~~210.~~ Pursuant to this persistent, widespread custom and unofficial policy, Defendants and officers of NCPD denied adequate language access to Plaintiffs and other class members with deliberate indifference for their constitutional rights.

205. ~~211.~~ This persistent, widespread practice of denying language access to those who requested it from NCPD was so pervasive that County officials with policy-making authority tacitly authorized the policy, had actual or constructive knowledge of the widespread custom and unofficial policy, and failed to do anything to end the unconstitutional custom and unofficial policy.

206. ~~212.~~ The widespread nature of the practice is evidenced by the findings of the LILAC report, and the failure of NCPD to take any remedial action in response to these findings.

207. ~~213.~~ Because the NCPD fails to investigate or discipline officers who deny language access, as evidenced by named Plaintiffs, its officers know that they are free to refuse to provide language access to those who request it, contributing to the widespread informal policy.

208. ~~214.~~ By reason of this widespread custom and unofficial policy, Defendants deprived Plaintiffs of their First and Fourteenth Amendment rights, in violation of 42 U.S.C. § 1983.

*Failure to Train*

209. ~~215.~~ Defendants failed to train officers in their obligation to provide language access to those who request or need it.

210. ~~216.~~ This failure to train is evident in the Plan itself, which requires that every officer in NCPD be provided with the Plan but does not require particularized training in officers' obligations to provide language access to those who request or need it.

211. ~~217.~~ This failure to train officers in their obligations to provide language access to those who request or need it was one of the moving forces behind Defendants' collective deprivations of Plaintiffs' First and Fourteenth Amendment rights under color of law.

212. ~~218.~~ NCPD's failure to train officers in their obligations was made knowingly and with reckless indifference to the constitutional rights of individuals with limited English proficiency.

213. ~~219.~~ NCPD's failure to train was made with deliberate indifference to Plaintiffs' constitutional rights.

***Failure to Discipline***

214. ~~220.~~ Acting under color of law and pursuant to official policy, practice, or custom, NCPD failed to investigate officers who do not provide language access to those who request or need it.

215. ~~221.~~ As set forth above, NCPD Internal Affairs Unit has never substantiated an allegation that an officer failed to provide language access.

216. ~~222.~~ Plaintiff M.C. made a complaint online to the NCPD Internal Affairs Unit but never received any follow up. Plaintiff V.A. also attempted to make a complaint in person on numerous occasions but was turned away without assistance.

217. ~~223.~~ This failure to investigate or discipline officers is one of the driving forces in the widespread policy of failing to provide language access. Officers who know they will not be investigated or held accountable for failing to provide language access believe that they are free to provide access or not based on their own whim.

218. ~~224.~~ In failing to investigate or discipline officers for failing to provide language access, Defendants NCPD and Nassau County were deliberately indifferent to the constitutional rights of those with limited English proficiency in Nassau County.

219. ~~225.~~ The failure to discipline officers is the direct and proximate cause of the harm suffered by Plaintiffs.

### Failure To Screen

220. ~~226.~~ Defendants have failed to make reasonable efforts to recruit or hire officers or staff who are proficient in languages other than English and who could therefore improve NCPD's ability to provide language access to those who request or need it.

221. ~~227.~~ Instead, NCPD allows officers and employees to self-certify their language fluency because it is deliberately indifferent to the rights of LEP individuals.

222. ~~228.~~ NCPD does not screen officers who claim they are fluent in a language other than English to determine whether or not they really are. Instead, NCPD simply counts any officer who states he or she is fluent in another language as a bilingual officer.

223. ~~229.~~ Combined with the overwhelming racial disparity of NCPD—which is nearly 90% white but polices a population that is over 40% non-white—this failure to screen results in fewer

officers who are able to speak languages other than English, and therefore lowers compliance with even the minimal standards set forth in the Plan.

224. ~~230.~~ NCPD's hiring practices are made in reckless disregard of the rights of LEP individuals.

225. ~~231.~~ NCPD's failure to screen hires for language fluency, and its failure to certify that those officers who claim they speak a language other than English actually do so, are the direct and proximate causes of Plaintiffs' injuries.

~~FIFTH~~**THIRD CAUSE OF ACTION**
**42 U.S.C. § 1983 –** *Monell* **Claim**
**First Amendment Violations**

226. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

227. Defendants, through their policy, custom or practice of denying language services to limited English proficient individuals, prevented Plaintiffs from petitioning the government for redress of grievances and otherwise communicating with police officers from whom they sought assistance.

228. Defendants acted under color of state law to deprive Plaintiffs of their First Amendment right to petition the government for redress of grievances.

229. Defendants Ryder, OFFICER DOE, and Sergeant Gregg were acting under color of state law when they developed and implemented policies and practices that were the direct and proximate causes of the depravation of Plaintiffs' rights to petition their government for redress of grievances.

230. 42 U.S.C § 1983 supplies a right of action to recover for these constitutional depravations.

231. As a direct and proximate result of Defendant's actions, Plaintiffs suffered injuries.

232. The First Amendment violations set forth above are the result of the policies and customs of NCPD to willfully fail to provide language access to LEP community members, and, under the five theories detailed in Plaintiff's Second Cause of Action, provide for liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 700-01 (1978).

## FOURTH CAUSE OF ACTION
### New York State Constitution, Article I, Section 11
### Equal Protection

233. ~~232.~~ Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

234. ~~233.~~ Defendants denied Plaintiffs equal access to the services and protections of NCPD based on their national origins.

235. ~~234.~~ Article I, Section 11 of the New York State Constitution provides that "No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state."

236. ~~235.~~ By failing to require that its officers provide language access to those who request or need it, Defendants have denied Plaintiffs and class members equal protection of the laws based on their race and national origin.

237. 236. Such discrimination violates the Equal Protection Clause of the New York State Constitution.

238. 237. As a direct and proximate result of Defendants' failures, Plaintiffs have suffered injuries and damages.

**SIXTHFIFTH CAUSE OF ACTION**
**28 U.S.C. § 2201**
**Declaratory Judgment**

239. 238. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

240. 239. Pursuant to 28 U.S.C. § 2201, Plaintiffs seek a declaratory judgment that NCPD's language access policies, as actually implemented, fail to provide language access to those in Nassau County who need or request it.

241. 240. Pursuant to 28 U.S.C. § 2201, Plaintiffs seek a declaratory judgment that NCPD's language access policies, as actually implemented, violated Plaintiffs' and class members' rights under the U.S. Constitution, Title VI of the Civil Rights Act of 1964, and the New York State Constitution.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that a judgment be entered in their favor and that the Court order and award the following relief:

A.    Issue a declaratory judgment that the actions, conduct and practices of Defendants set forth above violated Plaintiffs' rights under the U.S. Constitution, Title VI of the Civil Rights Act of 1964, and the New York State Constitution;

B.    Issue an order imposing a federal language access monitor on NCPD to evaluate its true compliance with the order of the Court and the requirements that NCPD provide language access to LEP individuals as required by federal, state, and local law. The term of the federal monitor shall depend on NCPD's establishing and continuing compliance as determined by the monitor and the Court. The monitor shall be selected by the Court at the conclusion of a public application process;

C.    Issue an order imposing a federal Internal Affairs monitor on NCPD to evaluate its Internal Affairs Unit and report to the Court any deficiencies that contributed to the constitutional violations. The term of the federal Internal Affairs monitor shall depend on NCPD's establishing and continuing compliance as determined by the Internal Affairs monitor and the Court. The Internal Affairs monitor shall be selected by the Court at the conclusion of a public application process.

D.    Issue an order requiring NCPD to abide by laws and policies requiring the provision of interpreter services or other language access services to those who request or need them;

E.    Issue an order requiring NCPD to refrain from unlawful treatment of LEP and foreign-born individuals;

F.          Issue an order that NCPD institute and implement policies and programs with respect to the provision of interpreter services and treatment of foreign-born and LEP communities that comply with all legal requirements, to be evaluated and reported by the language access monitor to the court on a regular basis;

G.          Issue an order that NCPD develop and implement a comprehensive language access plan and assign a full-time, qualified language access coordinator.

H.          Issue an order requiring NCPD to establish a system for tracking and monitoring NCPD practices regarding the use of interpreter services, including failures to use interpreter services;

I.          Issue an order requiring NCPD to institute measures to ensure compliance regarding language services, including ongoing documentation of requests for the provision of interpreter services and the responses to those requests by NCPD officers.

J.          Issue an order requiring NCPD to develop and implement appropriate training for members of the NCPD regarding treatment of LEP and foreign-born communities including when to provide an interpreter, how to properly work with interpreters, sensitivity training, and cultural competence;

K.          Issue an order requiring NCPD to develop appropriate supervisory procedures regarding the treatment of foreign-born and LEP communities and the provision of interpreter services to LEP individuals;

L.	Issue an order requiring NCPD to implement a system of reporting to the Plaintiffs and the Court regarding the steps taken to cure the violations of the Plaintiffs' and other LEP individuals' rights.

M.	Establish an entity independent of NCPD to review, investigate, and prosecute allegations that NCPD officers failed to comply with NCPD policies, including but not limited to those regarding the provision of language access.

N.	Order Defendants to pay reasonable costs and attorneys' fees to the Plaintiffs; and

O.	Grant any other relief the Court deems just and proper.


Respectfully submitted this ~~27th~~7th day of ~~October~~March, ~~2023~~2024.

| _/s/ Meena Roldán Oberdick_ | _/s/ Neil A. Steiner_ |
|---|---|
| ~~Fulvia Vargas-de Leon, Senior Counsel~~ | Neil A. Steiner |
| Meena Roldán Oberdick, Associate Counsel | May Chiang |
| Andrew Case, Supervising Attorney | Iricel Payano |
| LatinoJustice PRLDEF | Vishan J. Patel |
| 475 Riverside Drive #1901 | DECHERT LLP |
| New York, NY 10115 | Three Bryant Park |
| 212-219-3360 | 1095 Avenue of the Americas |
| ~~fvargasdeleon@latinojustice.org~~ | New York, New York 10036 |
| moberdick@latinojustice.org | Phone: (212) 698-3500 |
| acase@latinojustice.org | neil.steiner@dechert.com |
|  | may.chiang@dechert.com |
| _Attorneys for Plaintiffs_ | iricel.payano@dechert.com |
|  | vishan.patel@dechert.com |